Jeffrey Lee West v. State

COURT OF APPEALS

SECOND DISTRICT OF TEXAS

FORT WORTH

NO. 2-02-323-CR

JEFFREY LEE WEST APPELLANT

V.

THE STATE OF TEXAS STATE

------------

FROM THE 213TH DISTRICT COURT OF TARRANT COUNTY

------------

OPINION

------------

I.  I
ntroduction

A jury convicted Appellant Jeffrey Lee West (“West”) of four counts of aggravated sexual assault of a child under fourteen years of age.  The jury assessed West’s punishment at ten years’ community supervision on each of the first three counts and five years’ confinement on count four of the indictment.

West raises seventeen issues on appeal.  In issues one through ten, West alleges that the trial court’s refusal to permit him to cross-examine and impeach the victim, D.M., with certain entries and an omission from her diary violates  his Sixth Amendment right of confrontation.  In issues eleven and twelve, West contends that the trial court erred in admitting D.M.’s mother’s testimony.  Issue thirteen addresses the trial court’s refusal to grant West’s motion for mistrial.  Issues fourteen and fifteen 
challenge the constitutionality of the 
Allen
 charge the trial court gave to the jury.  Issues sixteen and seventeen challenge the legal and factual sufficiency of the evidence.  We will affirm.

II.  B
ackground Facts

West and D.M.’s mother, Ruth Dodson, married when D.M. was approximately three years old.  West was D.M.’s stepfather, as well as the father of two other daughters he had with Dodson.  In January 1999, Dodson’s father died, requiring her to travel out of the state for some period of time.  During this time, West took care of his stepdaughter, as well as the couple’s other two daughters.

Trial testimony showed that one evening, before Dodson returned to Texas, D.M. was ironing her school clothes in her mother and stepfather’s bedroom.  West approached her and instructed her to take off her panties and iron them, stating that this would “feel good.”  West then instructed the eleven-year-old to take off all her clothes so he could “teach [her] about sex.”  D.M. obeyed her stepfather.

West then instructed D.M. to get a mirror and come sit on the bed, and he proceeded to point out the features of the child’s genitalia.  West also used his fingers to guide his lesson on sex education.  Once he was through “instructing” the child with the mirror, he proceeded to remove his clothes and had D.M. hold his sexual organ in her hand and then directed her to lie down on the bed.  D.M. testified that West then put his mouth both on and inside her genitals.  Finally, West somewhat penetrated her genitals with his sexual organ until she told him to stop because he was hurting her.  Upon ending physical contact, West stated that he hoped D.M. had “learned something” so that she would not “need to go out and find out what it’s like.”  He also told D.M. not to tell anyone what had happened.

In January 2000, D.M. and her mother were kicked out of the Wests’ home, and a bitter divorce and custody battle over the two younger daughters ensued.  During the following summer, while spending summer visitation with her natural father, D.M. disclosed that West had inappropriately touched her. Thereafter, upon returning home to her mother’s residence in Galveston, Texas, D.M. disclosed partial details of the encounter to her mother.

Dodson contacted the toll-free, hotline number for Texas Child Protective Services.  The agency commenced an investigation into the safety of D.M.’s two younger sisters living in Arlington, as well as an investigation into D.M.’s accusations.  D.M.  was subsequently interviewed and videotaped at the child advocacy center in Galveston.  As a result of this investigation, West was indicted and then convicted of four counts of aggravated sexual assault of a child under fourteen years of age.

III.  T
he Diary

In his first nine issues, West complains that the trial court erred at the guilt-innocence phase of trial by refusing to permit him to cross-examine and impeach D.M. (1) with two entries from D.M.’s diary and (2) concerning the lack of a diary entry regarding the assault.  Specifically, the two entries that West asserted were admissible were: (1) a 
September 7,
 
1999
 entry in which D.M. wrote that she had said a few untrue things about her stepfather and that she was mad when she wrote those things (issues one, four, and seven); and (2) a 
February 6, 1999
 entry that discussed a “peck on the cheek” incident between D.M. and a classmate at a dance (issues three, six, and nine).  Finally, 
the omission
 West sought to question D.M. about was her failure to write in her dairy about the sexual assault despite an entry indicating that she intended to write “everything” in her diary (issues two, five, and eight).
(footnote: 1)  

Standard of Review

The trial court’s decision to admit or exclude evidence is afforded a great deal of discretion.  
Montgomery v. State
, 810 S.W.2d 372, 378-79 (Tex. Crim. App. 1990).  Therefore, we review a trial court’s ruling on admissibility or exclusion of evidence under an abuse of discretion standard.  
Angleton v. State
, 971 S.W.2d 65, 67 (Tex. Crim. App. 1998).  If the trial court’s evidentiary ruling is reasonably supported by the record and is correct under any theory of applicable law, we must uphold it—this is known as the “zone of reasonable disagreement” test.  
Montgomery
, 810 S.W.2d at 391.  “The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred.”  
Id.
 at 380.  We apply an abuse of discretion standard of review to West’s first through ninth issues.

The September 7, 1999 Diary Entry

West’s first and seventh issues concern the following entry in D.M.’s diary: “I know I’ve said a few things about daddy but almost all of them were not true.  I was mad when I wrote them.  I love daddy and I’ll miss him.  He has showed and taught me a lot.”  The record shows that D.M. referred to her stepfather as “daddy.”  West contends that the trial court abused its discretion by refusing to permit him to cross-examine D.M. with this diary entry because it was offered for impeachment purposes, not to prove the truth of the matter asserted, and, alternatively, because it falls within one of the hearsay exceptions.  
See
 T
ex. R. Evid. 803(24)
.

We hold that the trial court did not abuse its discretion by refusing to permit West to cross-examine D.M. with this diary entry.  D.M.’s diary was offered into evidence by West in a bill of exceptions.  Throughout the diary, D.M. writes as though the diary were an actual person, giving the diary a name and writing things like, “Also I probably didn’t tell you,” “I would tell you more, but,” and “So I guess I will go, talk to you later.”  
Thus, the trial court could have reasonably interpreted D.M.’s statement that “I know I’ve said a few things about daddy” that were not true, but “I was mad when I 
wrote them” 
as meaning that D.M. said bad things to her diary about West, but that these things were not true and she was mad when she 
wrote
 them.  [Emphasis added.]  Indeed, based on our review of the diary, we agree with the trial court that this was the probable meaning of D.M.’s statement.  Furthermore, the dairy contains no reference to the sexual assault at issue in this case.  Whatever untrue things D.M. purportedly wrote in her diary, they did not involve the present sexual assault.  Thus, they do not appear relevant except as an effort to show a general untruthful character, and for the reasons explained below, this specific incident of alleged untruthfulness is not admissible for that purpose.  
See
 Tex. R. Evid.
 401, 608.  Consequently, we cannot say that the trial court acted outside the zone of reasonable disagreement by refusing to permit West to cross-examine D.M. with this entry.  
See
 
Holt v. State
, 912 S.W.2d 294, 301 (Tex. App.—San Antonio 1995, pet. ref’d) (holding trial court did not err in refusing to permit defendant to cross-examine and impeach child sexual assault victim with diary entries); 
see also Ayers v. State
, 606 S.W.2d 936, 941 (Tex. Crim. App. 1980) (op. on reh’g) (holding murder victim’s personal diary found after trial did not warrant a new trial based on newly discovered evidence).  We overrule West’s first issue.

In his seventh issue, West claims that he should have been permitted to impeach D.M. with this entry after she testified that she had not become so angered at West that she said untrue things about West to others.  Great latitude should be allowed in cross-examining witnesses to reveal possible bias, prejudice, or self-interested motives to falsify testimony.  It is likewise true that the burden of showing the relevance of particular evidence to the issue of bias rests on its proponent.  
Chambers v. State
, 866 S.W.2d 9, 26-27 (Tex. Crim. App. 1993), 
cert. denied
, 511 U.S. 1100 (1994); 
Janecka v. State
, 739 S.W.2d 813, 830 (Tex. Crim. App. 1987). Moreover, the parameters of cross-examination for the showing of bias rests on the sound discretion of the trial judge.  
Chambers
, 866 S.W.2d at 27.  The trial judge must balance probative value against prejudicial risks, i.e., undue prejudice, embarrassment, harassment, confusion of the issues, and undue delay.  
Id.

Writing untrue things in a diary is not the same as saying untrue things to a live person.  D.M.’s diary entry that she said untrue things to her diary about West (but not regarding the sexual assault at issue) and that she was mad when she wrote those things does not establish D.M. lacked credibility or had bad character.  D.M. was never asked whether she wrote anything untrue about West.  Her diary entry that she said untrue things 
to her diary
 does not impeach her testimony that she had never said untrue things about West to a live person, nor does this entry show any bias by D.M.  Instead, the entry shows that D.M. loves West and states that she will miss him after the divorce.  Again, we cannot say that the trial court acted outside the zone of reasonable disagreement by refusing to admit D.M.’s diary entry or by refusing to permit West to use the entry to impeach D.M.  
See id.

Finally, as pointed out by the State, this diary entry was not admissible to show that D.M.’s character for truth-telling was poor.  Rule 608 of the Texas Rules of Evidence permits a party to prove a witness’s character for truthfulness or untruthfulness via opinion or reputation testimony.  
Tex. R. Evid. 
608. Because this diary entry involved a specific instance of conduct, i.e., writing false things in a diary, it was not admissible to impeach D.M.’s credibility or truthfulness.  For this reason, the trial court also did not act outside the zone of reasonable disagreement by refusing to admit D.M.’s diary entry or by refusing to permit West to use the entry to impeach D.M.  We overrule West’s seventh issue.

C. The February 6, 1999 Diary Entry

In his third and ninth issues, West claims that the trial court abused its discretion by refusing to permit him to cross-examine and impeach D.M. with a February 6, 1999 diary entry which reads, in part: “Also I probably didn’t tell you but Nick and I kissed each other on the cheak [sic] at the last dance.”  West argues that this “intimate contact” indicated “sexual behavior” that was inconsistent with the behavior of a child who had been sexually abused.  The trial court excluded this diary entry under rule 412 and as irrelevant.  
See
 
Tex. R. Evid. 401,
 412. 

The Texas Rules of Evidence define relevancy as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.”  
Tex. R. Evid.
 401.  The burden of showing the relevance of particular evidence to the issue of bias rests on its proponent.  
Chambers
, 866 S.W.2d at 26-27; 
Holt
, 912 S.W.2d at 301.  A trial court’s decision as to the relevancy of evidence depends wholly upon “one judge’s perception of common experience.”  
Montgomery
, 810 S.W.2d at 391 (citing
 Weinstein & Berger, Weinstein’s Evidence
, 401-53 (1990)).  Thus, questions of relevance should be left largely to the trial court and will not be reversed absent an abuse of discretion.  
Moreno v. State
, 858 S.W.2d 453, 463 (Tex. Crim. App.), 
cert. denied
, 510 U.S. 966 (1993).

West claims D.M.’s kiss on the cheek with Nick was relevant because this  “intimate contact” is behavior inconsistent with that of a child recently molested.  This argument alleged as fact, i.e., that sexually abused girls do not have intimate contact with boys in their peer group, was never proven.  In fact, West’s expert testified that “sexually promiscuous” behavior is a good indication that a child has been sexually abused, which seems to run counter to West’s position.  In light of the lack of evidence showing that a young girl who had been recently sexually assaulted would be unlikely to kiss a boy on the cheek at a dance, the disputed evidence lacks any probative value.  
See Boyle v. State
, 820 S.W.2d 122, 149 (Tex. Crim. App. 1991) (op. on reh’g) (holding trial court properly excluded diary entry documenting victim’s past sexual behavior because it lacked probative value), 
cert. denied
, 503 U.S. 921 (1992).  The trial court acted within the zone of reasonable disagreement by concluding that this diary entry was not relevant and by excluding it on that basis.  We overrule West’s third and ninth issues.

The Diary Omission

In his second and eighth issues, West complains that the trial court erred by refusing to allow him to impeach D.M. with the fact that she failed to make a diary entry regarding the assault despite writing in her diary that she intended to write “everything” in it.  Thus, West argues that D.M.’s failure to record her stepfather’s assault impacts her credibility.

We hold that the trial court did not abuse its discretion by refusing to permit West to impeach D.M. by questioning her about her failure to record the sexual assault in her diary despite writing that she would include “everything” in it.  D.M. was not under oath when she wrote that she intended to record everything in her diary.  She had no moral, ethical, or legal obligation to write anything in the diary at all.  The fact that an eleven-year-old girl at some point intended to write in her diary more frequently and wrote, “You are sort of my Jewl because I keep you and treasure you because 
I write everything in you
 and tell you all my feelings and stuff” simply does not impact the credibility of her testimony concerning nondiary-entry events.  [Emphasis added.]  We overrule West’s second and eighth issues.

E. Did the State Open the Diary Door?

On redirect examination by the State, D.M. testified that she had not recorded anything about the assault in her diary.  West argues in issues four, five, and six, that via this question—whether D.M. ever wrote anything in her diary regarding what West did to her—the State opened the door for him to cross-examine and impeach D.M. with the September 7, 1999 and the February 6, 1999 diary entries as well as with the diary omission. 

“Rule 107 is one of admissibility and permits the introduction of otherwise inadmissible evidence when that evidence is necessary to fully and fairly explain a matter ‘opened up’ by the adverse party.” 
 
Johnson v. State
, 747 S.W.2d 451, 453-54 (Tex. App.—Houston [14
th
 
Dist.] 1988, pet. ref’d).  “The so-called rule of optional completeness takes effect when other evidence has already been introduced but is incomplete and misleading.”  
Jones v. State
, 963 S.W.2d 177, 182 (Tex. App.—Fort Worth 1998, pet. ref’d).  Once an evidentiary door has been opened by one side, this rule serves to allow the other side to complete the picture.  The party who opens the door may not then invoke the rule of optional completeness to further exploit an improper line of questioning.  
See Hatley v.
 
State
, 533 S.W.2d 27, 29 (Tex. Crim. App. 1976);
 Jones
, 963 S.W.2d at 182.

When D.M. and her mother moved out of the Wests’ home, D.M. left behind her diary.  West’s counsel brought the diary to trial and first broached the topic of D.M.’s diary.  D.M. testified that she had forgotten all about the diary. West’s counsel made numerous attempts to question D.M. about certain diary entries and her failure to make certain entries.  As a result of West’s counsel’s cross-examination of D.M., it is highly probable that the jury was left with the impression that there was something in the diary relevant to the charged sexual assault incident.  Therefore, on redirect examination of D.M., the State invoked the rule of optional completeness and clarified that the diary contained nothing relevant to the assault at issue by asking D.M. whether she recognized the diary and whether she ever wrote anything in the diary about the abuse.  D.M. answered that the diary was hers and that she did not write anything in it about the abuse, giving the exact testimony West’s counsel had attempted to elicit from her.  Under these circumstances, contrary to West’s contentions, the State’s two questions did not open the door to West’s use of the diary to impeach D.M.  
See, e.g.,
 
Credille v. State
, 925 S.W.2d 112, 116 (Tex. App.—Houston [14
th
 Dist.] 1996, pet. ref’d).  We overrule issues four, five, and six.

IV.  Mom’s Testimony

A. As an Outcry Witness

In his eleventh issue, West maintains that the testimony of D.M.’s mother, Ruth Dodson, constituted inadmissible hearsay.  He claims that the trial court abused its discretion by admitting Dodson’s testimony concerning D.M.’s outcry because the State designated D.M.’s father as the outcry witness.  
See
 
Tex. Code Crim. Proc. Ann.
 art. 38.072 (Vernon Supp. 2003).

Article 38.072 allows the first person to whom the child described the offense in some discernible manner to testify about the statements the child made. 
 Id.
; 
Garcia v. State
, 792 S.W.2d 88, 91 (Tex. Crim. App. 1990). Because of the way in which the statute is written, an outcry witness is not person-specific, but event-specific.  
Broderick v. State
, 35 S.W.3d 67, 73 (Tex. App.—Texarkana 2000, pet. ref’d).  Before more than one outcry witness may testify, however, the outcry must be about different events and not simply a repetition of the same event as related by the victim to different individuals.  
Id.
  But there may be only one outcry witness to the victim's statement about a single event, and the proper outcry witness to a single event is the first adult person other than the defendant to whom the victim made a statement describing the incident.  
Id.
; 
see also Thomas v. State
, 1 S.W.3d 138, 142 (Tex. App.—Texarkana 1999, pet. ref’d) (holding proper outcry witness is not to be determined by comparing the statements the child gave to different individuals and then deciding which person received the most detailed statement about the offense).

Here, in accordance with article 38.072, the State designated the child’s natural father as its outcry witness.  
Tex. Code Crim. Proc.
 
Ann
. art. 38.072. After the State made its outcry designation, it nonetheless called Dodson, D.M.’s mother, to testify about D.M.’s statements to her regarding the same event.  Because the State designated D.M.’s father as the outcry witness,  Dodson’s testimony regarding D.M.’s statements to her about this same assault constituted inadmissible hearsay.  
See
 
Thomas
, 1 S.W.3d at 142.  Thus, the trial court abused its discretion by admitting Dodson’s hearsay testimony over West’s objection.  
See
 
Josey v. State
, 97 S.W.3d 687, 698 (Tex. App.—Texarkana 2003, no pet.) (holding trial court erred by permitting testimony of third outcry witness as to same event over defendant’s hearsay objection);
 Broderick
, 35 S.W.3d at 73-74 (holding trial court erred by permitting testimony of second outcry witness as to same event over defendant’s hearsay objection).

Having determined that the trial court erred by admitting Dodson’s testimony over West’s hearsay objection, we now apply a rule 44.2(b) harm analysis.  
Tex. R. App
. P. 44.2; 
see
 
Josey
, 97 S.W.3d at 698;
 
Broderick
, 35 S.W.3d at 73-74.  The reviewing court must deem the error harmless if, after reviewing the entire record, the court is reasonably assured the error did not influence the jury's verdict or had but a slight effect.  
Josey
, 97 S.W.3d at 698.  If the same or similar evidence is admitted without objection at another point during the trial, the improper admission of the evidence will not constitute reversible error.  
Id.

Dodson’s hearsay outcry testimony was that, in response to her questioning of D.M., D.M. stated that her stepfather had put his hands on her, that he had put his mouth on her, that she did not have her clothes on, and that West was not clothed.  D.M. herself, however, gave detailed testimony concerning the assault.  She testified that during the assault West “pointed out my different parts, my vagina and my clitoris”; “spread the skin . . . back and showed me”; touched her “breasts and nipples” “and had me touch them, also”; “asked me if I wanted to see what a penis looked like and that’s when he took his clothes off to show me”; “showed me the head and explained that to me”; asked her to touch his penis, “so I can see what it’s like when a man became aroused”; “said I would have to put my mouth on it in order for him to be able to ejaculate”; asked her to put her mouth on his penis; said, “So you don’t ever want to know what it’s like for a guy to put his mouth on you, I’m going to show you”; “put his mouth on my genitals” and she felt his tongue going inside; and said, “I’m going to show you what it’s like for a guy’s penis to go in you, and he tried to put his penis in me.”

Here, Dodson’s hearsay testimony was not harmful in light of D.M.’s detailed, factually specific testimony concerning the assault.  We are reasonably assured that the error in admitting Dodson’s hearsay outcry testimony did not influence the jury's verdict or had but a slight effect.  
See
 
Tex. R. App. P.
 44.2(b); 
see also
 
Anderson v. State
, 717 S.W.2d 622, 627 (Tex. Crim. App. 1986).
  
We overrule West’s eleventh issue.

B. As to the Social Workers’ Recommendation

In his twelfth issue, West maintains that the trial court erred by admitting  Dodson’s testimony that a social worker recommended Dodson talk to D.M. about the assault incident.
(footnote: 2)  West contends that this testimony also was inadmissible hearsay.  The State, on the other hand, argues that the social worker’s recommendation was not offered to prove the truth of the matter asserted—that Dodson should talk to D.M.—but instead simply to “give some context” to what Dodson did next, i.e., talk to D.M.

Out-of-court statements admitted for the purpose of explaining how a defendant became a suspect and not for the truth of the matter asserted do not constitute inadmissible hearsay.  
Dinkins v. State
, 894 S.W.2d 330, 347 (Tex. Crim. App.), 
cert. denied
, 516 U.S. 832 (1995); 
Cano v. State
, 3 S.W.3d 99, 110 (Tex. App.—Corpus Christi 1999, pet. ref’d).  Likewise, out-of-court statements may be admitted as circumstantial evidence from which an inference may be drawn, and not for the truth of the matter stated therein, without violating the hearsay rule.  
Gholson v. State
, 542 S.W.2d 395, 398 (Tex. Crim. App. 1976), 
cert. denied
, 432 U.S. 911 (1977).

The mother’s testimony here was not offered to prove the truth of the matter asserted but to show contextually what happened next.  In other words, the testimony was admitted to show what happened next in the chain of events once D.M. had been interviewed on videotape.  If the statement was offered to prove the truth of the matter asserted, i.e, the social workers’ opined that for therapy required D.M.’s mother to talk to her, then it would be hearsay.  
See
 
Levario v. State
, 964 S.W.2d 290, 296 (Tex. App.—El Paso 1997, no pet.).  We hold that Dodson’s testimony was not hearsay and that, therefore, the trial court did not err by admitting it over West’s hearsay objection.

Relying on 
Miller-El v. State
, West also claims that the direction of the State’s questioning of Dodson was “patently driven” towards eliciting forbidden victim impact evidence.  782 S.W.2d 892, 895 (Tex. Crim. App. 1990).  The facts in 
Miller-El
, however, are distinguishable from the present facts. In 
Miller-El
, the victim was shot, severing his spinal cord and paralyzing him. 
 Id.
 at 894. The court of criminal appeals recognized that the defendant’s treating doctor’s testimony that the victim would have special needs for the rest of his life, that as a result of the paralysis he would never regain bladder and bowel control or sexual and procreative functions, that he would be required to maintain a constant vigilance to prevent infection and bed sores, and that recurring spasticity could ultimately deprive him even of the use of a wheelchair, constituted victim impact testimony and was inadmissible at the guilt innocence phase of the trial.  
Id.
 at 894-95.  By contrast, here, Dodson’s testimony that, after D.M. was interviewed, social workers told Dodson to talk to D.M. is not the sort of testimony designed to “inflame the minds of the jury” as was the testimony in 
Miller-El
.  
Id.
 at 893.  The State’s questioning was either not intended to elicit victim impact testimony or was curtailed by West’s objection before any victim impact testimony was elicited.  We overrule West’s twelfth issue.  

V.  
West’s Motion for Mistrial

In issue thirteen, West argues that the trial court erred by denying his motion for mistrial after the State prefaced a question to Dodson with the statement, “Now, this is really important, Ms. Dodson.”  Following this comment, West objected.  The trial court sustained West’s objection and instructed the jury to disregard the prosecutor’s comment.  West moved for a mistrial, and the trial court denied his motion.  Following this exchange, the State asked Dodson whether she had coached D.M. in her accusations against West.  Dodson answered that she had not.

A. Standard of Review

Mistrials are an extreme remedy for prejudicial events occurring during the trial process.  
Bauder v.
 
State
, 921 S.W.2d 696, 698 (Tex. Crim. App. 1996); 
Jackson v. State
, 50 S.W.3d 579, 588 (Tex. App.—Fort Worth 2001, pet. ref’d).  The declaration of a mistrial ought to be an exceedingly uncommon remedy for residual prejudice remaining after objections are sustained and curative instructions given.  
Bauder
, 921 S.W.2d at 698.  For this reason, judicial admonishments to the jury are presumed effective.  
Id.
 (citing 
Waldo v. State
, 746 S.W.2d 750, 754 (Tex. Crim. App. 1988)).

When the trial court sustains an objection and instructs the jury to disregard but denies a defendant's motion for a mistrial, the issue is whether the trial court erred in denying the mistrial.  
Goodwin v. State
, 91 S.W.3d 912, 916 (Tex. App.—Fort Worth 2002, no pet.).  Its resolution depends on whether the court's instruction to disregard cured any prejudicial effect.  
Id
.  Only when it is apparent that an objectionable event at trial is so emotionally inflammatory that curative instructions are not likely to prevent the jury being unfairly prejudiced against the defendant is a trial court required to grant a mistrial.  
Bauder
, 921 S.W.2d at 698.
  
We review the trial court’s denial of a mistrial deferentially under an abuse of discretion standard.  
Trevino v. State, 
991 S.W.2d 849, 851 (Tex. Crim. App. 1999);
 Jackson, 
50 S.W.3d at 588. 

Instruction Presumed Effective

Immediately after sustaining West’s objection to the prosecutor’s prefatory comment, “Now, this is really important, Ms. Dodson,” the trial court instructed the jury to “not consider the last remark for any purpose.”  We must presume that this instruction was effective.  
See Bauder
, 921 S.W.2d at 698.  The comment made by the State here simply was not an objectionable event that was so emotionally inflammatory that it undermined the efficacy of the trial court's instruction to disregard.   
See id.
 (citing
 Kemp v. State
, 846 S.W.2d 289, 308 (Tex. Crim. App. 1992), 
cert. denied
, 508 U.S. 918 (1993)); 
see also Jones v. State
, 100 S.W.3d 1, 5 (Tex. App.—Tyler 2002, pet. ref’d) (holding trial court did not abuse discretion by denying mistrial when State elicited testimony regarding defense witness's two stale misdemeanor theft convictions). Consequently, the trial court did not abuse its discretion by denying West’s motion for a mistrial.  We overrule West’s thirteenth issue.

VI.  
The 
Allen
 Charge

In his fourteenth and fifteenth issues, West argues that the trial court erred by overruling his objection to the 
Allen
 charge and that, although he did not object, the 
Allen
 charge’s “partial definition” of reasonable doubt caused him egregious harm, entitling him to reversal under 
Almanza
.  
Almanza v. State
, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh’g).

Standard of Review

An 
Allen
 charge is usually given in response to a specific request from the jury during situations in which the jury is deadlocked.  
Jackson v. State
, 753 S.W.2d 706, 712 (Tex. App.—San Antonio 1988, pet. ref'd).  An 
Allen
 charge jury instruction will constitute reversible error only if, on its face, it is so improper as to render jury misconduct likely or jury misconduct is demonstrated to have occurred in fact.  
Calicult v. State
, 503 S.W.2d 574, 576 n.2 (Tex. Crim. App. 1974).  To prevail on a complaint that an 
Allen
 charge is coercive, an accused must show that jury coercion or misconduct likely occurred or occurred in fact. 
Love v. State
, 909 S.W.2d 930, 936 (Tex. App.—El Paso 1995, pet. ref’d); 
Jackson
, 753 S.W.2d at 712; 
Davis v. State
, 709 S.W.2d 288, 291 (Tex. App.—Corpus Christi 1986, pet. ref'd), 
cert. denied
, 481 U.S. 1057 (1987).  An 
Allen
 charge is unduly coercive and therefore improper only if it pressures jurors into reaching a particular verdict or improperly conveys the  court’s opinion of the case. 
 
Arrevalo v. State
, 489 S.W.2d 569, 571 (Tex. Crim. App. 1973)).

Allen Charge Not Coercive

Following a five-day trial, the jury retired to deliberate at about 4:40 p.m. on the last day of trial.  After deliberating some time, the jury sent out a note indicating that it was deadlocked.  Eventually, at approximately 5:55 p.m., the jury retired for the evening without reaching a verdict.  Deliberations recommenced the following morning.  At approximately 1:53 p.m., the jury sent out another note stating that it was unable to reach a verdict.
(footnote: 3)  The trial court met with the attorneys, and all agreed that the trial court would inquire as to the numerical split of the jury.
(footnote: 4)  At approximately 2:00 p.m. the jury sent out a note indicating that the split was 11 to 1.  The trial court then decided to give the supplemental jury instruction known as an 
Allen
 charge.  West’s counsel objected, pointing out that the jury “has had 24 hours to think about this,” “[t]hey have slept overnight on it,” and “ha[ve] expressed their opinion that they [could not] reach a verdict at least one time.”  West’s counsel also asserted that because the court knew that there was one hold-out juror, the 
Allen
 charge was unduly coercive on that juror.  The trial court overruled West’s objections and, at 2:07 p.m., instructed the jury as follows:

Members of the jury, you are instructed that in a large proportion of cases absolute certainty cannot be expected.  Although the verdict must be the verdict of each individual juror and not a mere acquiescence in the conclusion of other jurors, each juror should show a proper regard for the opinions of the other jurors.  

You should listen, with a disposition to being convinced, to the arguments of the other jurors.  If a large number of jurors are for deciding the case in one way, those in the minority should consider whether they are basing their opinion on speculation or guesswork and not on the evidence in the case.  

. . . .

If this jury find [sic] itself unable to arrive at a unanimous verdict, it will be necessary for the Court to declare a mistrial and discharge the jury. The indictment will still be pending, and it is reasonable to assume that the case will be tried again before another jury at some future time.  Any such future jury will be empaneled in the same way this jury has been empaneled and will likely hear the same evidence which has been presented to this jury.  

The questions to be determined by that jury will be the same questions confronting you, and there is no reason to hope that the next jury will find these questions any easier to decide than you have found them.  

With this additional instruction, you are instructed to continue deliberations in an effort to arrive at a verdict that’s acceptable to all members of the jury if you can do so without doing violence to your conscience. 

The jury subsequently returned a unanimous verdict. 

T
he instructions contained in the 
Allen
 charge utilized here are consistent with similar instructions used in 
Allen
 charges used throughout this state and have been held to be noncoercive.  
See, e.g., Howard v. State, 
941 S.W.2d 102, 123 (Tex. Crim. App. 1996); 
Arrevalo
, 489 S.W.2d at 571-72; 
Willis v. State
, 761 S.W.2d 434, 437-38 (Tex. App.—Houston [14
th
 Dist.] 1988, pet. ref'd); 
Rodela v. State
, 666 S.W.2d 652, 652-53 (Tex. App.—Corpus Christi 1984, pet. ref'd); 
Ray v. State
, 649 S.W.2d 142, 146-47 (Tex. App.—Fort Worth 1983, pet. ref'd),
 superseded by rule on other grounds, Bee v. State
, 974 S.W.2d 184, 188-89 (Tex. App.—San Antonio 1998, no pet.)
; M.J. 
McCormick et al.
,
 
Texas Practice: Criminal
 
Practice and Forms Manual
 § 96.31 (10th ed. 1995).  Likewise, the Fifth Circuit has consistently upheld the use of similar, if not identical, 
Allen
 charge jury instructions.
  
See, e.g., United States v. Kelly
, 783 F.2d 575, 576-77 (5th Cir.), 
cert. denied
, 479 U.S. 889 (1986); 
United States v.
 
Anderton
, 679 F.2d 1199, 1203 n.3 (5th Cir. 1982); 
United States v. Bottom
,  638 F.2d 781, 786 (5th Cir. 1981).

The 
Allen
 charge here does not contain the type of language courts have held to be problematic and coercive.  
See, e.g., Green v. United States
, 309 F.2d 852, 855 (5th Cir. 1962) (holding 
Allen
 charge was coercive that told jury that it is the duty of the minority to listen to the argument of the majority with some distrust of their own judgment because the rule is that the majority will have better judgment than the mere minority).  West does not point to any specific language that he contends was coercive, and after reviewing the instruction, we see no language that shows jury coercion likely occurred. Specifically, the 
Allen
 charge given here does not tell the jury that one side or the other possesses the superior judgment, nor does it tell them to distrust their judgment. 
 Additionally, the trial court carefully concluded the 
Allen
 charge by instructing the jury that, in any event, it should try to arrive at a verdict acceptable to all jurors only if it could do so “without doing violence to your conscience.”  We hold that the trial court did not err by overruling West’s unduly-coercive objection to the 
Allen
 charge.  We overrule issue fourteen.

C. No Partial Definition of Reasonable Doubt

In his fifteenth issue, West claims that the 
Allen
 charge contained a partial definition of reasonable doubt, thereby violating 
Paulson v. State
, 28 S.W.3d 570, 573 (Tex. Crim. App. 2000).  Specifically, West complains that the first sentence of the 
Allen
 charge is a partial definition of reasonable doubt: “Members of the jury, you are instructed that in a large proportion of cases absolute certainty cannot be expected.”  West did not object to the 
Allen
 charge on this basis.  Instead, he claims that 
Almanza
 applies and that despite the lack of an objection he is entitled to reversal if he suffered egregious harm from the allegedly erroneous partial definition.  The State, however, contends that 
Almanza
 does not apply to 
Allen
 charges at all.

We do not need to reach the issue of whether 
Almanza
 applies to 
Allen
 charges because, in any event, neither of the harm standards set out in article 36.19 and construed in 
Almanza
 applies unless an appellate court first finds “error” in the jury charge. 
 Tex. Code Crim. Proc. Ann.
 art. 36.19 (Vernon 1981)
; Almanza,
 686 S.W.2d at 174;
 Posey v. State
, 966 S.W.2d 57, 60 (Tex. Crim. App. 1998).  When we evaluate a jury charge for a reasonable-doubt-definition error, we first determine whether a definition of reasonable doubt exists in the jury charge.  
Paulson
, 28 S.W.3d at 573; 
Minor v. State
, 91 S.W.3d 824, 828 (Tex. App.—Fort Worth 2002, pet. ref’d) (citing 
Carriere v. State
, 84 S.W.3d 753, 759 (Tex. App.—Houston [1st Dist.] 2002, pet. ref’d)).  If not, the charge does not violate 
Paulson
.  
Minor
, 91 S.W.3d at 828.

Here, the trial court simply instructed the jury that “in a large proportion of cases absolute certainty cannot be expected.”  In 
Geesa v. State
, 820 S.W.2d 154, 162 (Tex. Crim. App. 1991), the required jury instruction attempted to define reasonable doubt three times:  (1)“A ‘reasonable doubt’ is a doubt based on reason and common sense after a careful and impartial consideration of all the evidence in the case”; (2)
 “It is the kind of doubt that would make a reasonable person hesitate to act in the most important of his own affairs”; and (3)
 “Proof beyond a reasonable doubt, therefore, must be proof of such a convincing character that you would be willing to rely and act upon it without hesitation in the most important of your own affairs.”
  However, 
Paulson
 specifically overruled this portion of 
Geesa
 that required trial courts to instruct juries on the definition of “beyond a reasonable doubt.”  
Paulson
, 28 S.W.3d at 573.  The instruction in the present case did not include any of the overruled instructions and thus did not define the concept of reasonable doubt at all. Consequently, the trial court did not violate 
Paulson
 by submitting the instruction.
  
See Minor
, 91 S.W.3d at 828.  We hold that the trial court did not err by including the instruction that “in a large proportion of cases absolute certainty cannot be expected” in its 
Allen
 charge.  Accordingly, we overrule West’s fifteenth issue.

VII.  Sufficiency of the Evidence

In his sixteenth and seventeenth issues, West challenges the factual and legal sufficiency of the evidence to support his convictions.  West raises five grounds for his contention that the evidence is legally and factually insufficient: (1) the lack of “physical evidence or corroboration” of D.M.’s testimony; (2) the lack of evidence that D.M. suffers from any of the “symptoms” of a child sex abuse victim; (3) the evidence that D.M. was motivated to fabricate allegations against him because of the “nasty and bitterly contested divorce and child custody fight” between Dodson and West concerning their two children; (4) the evidence of an “inordinate” amount of time between the alleged assault and D.M.’s allegations; and (5) the lack of evidence indicating in any way that West “fits the profile of a person who would commit this offense.” 

Legal Sufficiency Standard of Review

In reviewing the legal sufficiency of the evidence to support a conviction, we review all the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  
Jackson v. Virginia
, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); 
Burden v. State
, 55 S.W.3d 608, 612 (Tex. Crim. App. 2001).  This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  
Jackson
, 443 U.S. at 319, 99 S. Ct. at 2789.  When performing a legal sufficiency review, we may not sit as a thirteenth juror, reevaluating the weight and credibility of the evidence and, thus, substituting our judgment for that of the fact finder. 
Dewberry v. State
, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999), 
cert. denied
, 529 U.S. 1131 (2000).

Application of Legal Sufficiency Standard to Facts

As previously outlined, D.M. provided a detailed account of the assault to the jury.  This testimony alone is legally sufficient to support West’s conviction. 
See, e.g., Empty v. State
, 972 S.W.2d 194, 196 (Tex. App.—Dallas 1998, pet. ref’d) (noting testimony of child victim alone is sufficient to support conviction for sexual assault); 
Ruiz v. State
, 891 S.W.2d 302, 304 (Tex. App.—San Antonio 1994, pet. ref'd) (same); 
Karnes v. State
, 873 S.W.2d 92, 96 (Tex. App.—Dallas 1994, no pet.)  (same).  We overrule West’s seventeenth issue. 

Factual Sufficiency Standard of Review

In reviewing the factual sufficiency of the evidence to support a conviction, we are to view all the evidence in a neutral light, favoring neither party.  
Johnson v. State
, 23 S.W.3d 1,7 (Tex. Crim. App. 2000); 
Clewis v.
 
State
, 922 S.W.2d 126, 129, 134 (Tex. Crim. App. 1996).  Evidence is factually insufficient if it is so weak as to be clearly wrong and manifestly unjust or the adverse finding is against the great weight and preponderance of the available evidence.  
Johnson
, 23 S.W.3d at 11.  Therefore, we must determine whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the verdict, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof.  
Id.
  In performing this review, we are to give due deference to the fact finder’s determinations.  
Id.
 at 8-9; 
Clewis
, 922 S.W.2d at 136.  We may not substitute our judgment for that of the fact finder’s.  
Johnson
, 23 S.W.3d at 12.  Consequently, we may find the evidence factually insufficient only where necessary to prevent manifest justice.  
Johnson
, 23 S.W.3d at 9, 12; 
Cain v. State
, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).

To make a determination of factual insufficiency, a complete and detailed examination of all the relevant evidence is required.  
Johnson
, 23 S.W.3d 12. A proper factual sufficiency review must include a discussion of the most important and relevant evidence that supports the appellant’s complaint on appeal.  
Sims v. State
, 99 S.W.3d 600, 603 (Tex. Crim. App. 2003).

Application of Factual Sufficiency Standard to Facts

The State’s first witness was D.M.’s father.  He testified that after he and Dodson divorced, Dodson married West.  In the summer of 2000, when D.M. was visiting her father, they had a conversation about sexual abuse.  D.M.’s father later realized that D.M. had been talking about an incident that had occurred to her, but she asked him not to tell anyone and said that she would tell her mother when she got home.

Dodson testified that her father passed away on January 15, 1999, and after the funeral she remained in Missouri while D.M. and the other children returned home with West.  Dodson testified that after she divorced West, one day she was telling D.M. that she and D.M. needed to make an effort to get along with West.  D.M. said she did not want anything to do with West, and when Dodson pressed her for an explanation, D.M. said West had “done some things to her.”  Dodson later pressed D.M. for more information, and D.M. agreed to answer a few questions.  Dodson learned that West had touched D.M. and put his mouth on her and that neither of them had their clothes on. Eventually, in January 2001, Dodson called Child Protective Services (“CPS”) regarding the assault. Dodson took D.M. to a Children’s Advocacy Center and to a counselor. 

Through cross-examination of Dodson, the defense established that D.M. does well in school and is outgoing.  The defense also established that West successfully brought a contempt action against Dodson in September 2001 for failure to pay child support to him for their two children who resided with West. After CPS investigated D.M.’s assault, the agency did not remove these two other minor female children from his home.

During D.M.’s testimony she identified West as her former stepfather and as the person who assaulted her when she was eleven years old.  D.M. said that West showed her 
Playboy
 magazines several times prior to the assault and made comments like “can you see why that would turn a guy on?” and “[w]ould you ever do something like that?”  One night, while Dodson was still in Missouri, D.M. was in West and Dodson’s bedroom ironing jeans to wear to school the next day.  West started asking her what she knew about sex, and after they talked for a little bit, he asked her if she had ever ironed her underwear. Eventually, West told D.M. to iron her panties, and she bent over to take them off from under her nightshirt.  West instructed her to take off her nightshirt too, so she did.  After D.M. put on her ironed panties, West told her, “I’m going to teach you about sex because your mother will never do so.  That’s not her thing. She doesn’t like to talk about it or anything.  So I have to be the one to teach you.”  West then told D.M. to take off her panties, and as D.M. sat on the side of the bed, West held a little mirror, touching D.M.’s private parts and telling her, this is your vagina, “this is your clitoris.”  West touched D.M.’s breasts and nipples and had her touch them also.  West then took off his clothes and “showed” D.M. his penis.  West told D.M. to touch his penis so she could see what it was like when a man becomes aroused.  West told her that if she wanted to see what an ejaculation was, she would have to move her hand up and down.  West then told her she would have to put her mouth on his penis so he could ejaculate, but D.M. refused.  West told D.M. to lay down on the bed and spread her legs so he could “show [her] something else.”  He told her because “you don’t ever want to know what it’s like for a guy to put his mouth on you, I’m going to show you what that’s like.”  D.M. said West put his mouth on her vagina and clitoris and said she could feel it going inside of her.  D.M. testified, “After he did that for a while, he’s like, ‘Okay, I’m going to show you what it’s like for a guy’s penis to go in you,’ and he tried to put his penis in me.”  West put is penis inside her vagina “a little bit,” but D.M. told him it hurt and eventually he stopped.  West told D.M., “Okay, well, I hope you learned something.  Now you don’t need to go out and find out what it’s like.  It’s getting late.  You should go to bed.”  He also told her, “Don’t tell anybody what happened.  They won’t believe you and I’ll get in a lot of trouble and you don’t want me to get in trouble, right?  You love me?”  D.M. testified that she did not tell anyone about the assault because she trusted West and thought that it was really a lesson and that she needed to know those things.

D.M. testified that eventually she told her mother that West had “done some things” to her, but she never told her mother the whole story.  D.M. said her mother kept questioning her and said she would tell a little bit more and a little bit more.  But D.M. said it was a very hard subject to talk about, and she did not like talking about it.

Several witnesses testified for the defense, including West and Dodson’s daughter, T.W.  T.W. was nine years old at the time of trial and testified that D.M. never told her that West had touched D.M.’s private parts.  Kelly McGee testified that she lives in Missouri and has known West for about twenty-five years.  She testified that West has never exhibited poor impulse control, a need for immediate gratification, drug or alcohol abuse, anger problems, or low self-esteem.  She testified that West’s reputation for being a peaceful and law- abiding citizen in the community was good.  Joe McGee, Kelly McGee’s husband, testified that he went to high school with West and that West’s reputation in the community for being a peaceful and law-abiding citizen was good.  He agreed with his wife’s testimony that West never exhibited the characteristics outlined above.  George Sorrell, West’s new father-in-law, testified that he has known West for approximately two years.  The defense asked Sorrell about the same character traits, and he denied ever seeing West exhibit any of the traits.  Judy Sorrell Niemeier testified that she has known West since West was in high school.  When West was in high school, he dated Niemeier’s daughter.  She likewise testified that West has never exhibited the list of character traits set forth above.

West’s wife, Dana Suzanne West, also testified.  She said that in April 2000 she saw West give a thirteenth birthday gift to D.M.  She said D.M. hugged West and acted glad to see him.  Dana explained that she lives with West and she has never observed any pornography in the house.  West has never expressed any unusual interest in sexual activity, is not manipulative, is not easily angered or frustrated, had not demonstrated an immediate need for gratification, and is not fascinated with sex or sexual things.  Charles Winston, a friend of West’s for twenty years, and Paul Watkins, a friend of West’s for eight years, also testified that they never observed West exhibit any deviant character traits.  Carol Winston provided the same type of testimony.

Bradley Craig testified that he is a social worker and that he conducted about 900 social study investigations.  He testified that standard “red flags” for child sexual abuse are withdrawal, excessive daydreaming, poor relationships with peer groups, poor self-esteem, a deterioration in academic performance, sexual promiscuity, drug use, and decreased school attendance.

During West’s testimony, he denied any sexual contact with D.M. and specifically denied that he committed any of the acts alleged in the indictment. West explained that while he was married to Dodson, she had an affair that led to the couple’s divorce.  The evening that West found out about the affair, he asked both Dodson and D.M. to leave the house.  He went to D.M.’s room and told her to pack a bag and that she would have to leave because her mother was having an affair.  West said D.M. was very upset and crying.  In the divorce, West obtained custody of the couples’ two minor girls.  Despite D.M.’s accusations, CPS has not removed these two girls from West’s custody.

Having carefully examined the evidence in a neutral light, including the evidence relevant and supportive of West’s sufficiency of the evidence arguments on appeal, we hold that the proof of West’s guilt is not so weak as to undermine confidence in the jury’s verdict.  Further, we hold that the evidence of West’s guilt is not outweighed by contrary proof and that West’s convictions for aggravated sexual assault are supported by factually sufficient evidence.  We overrule West’s sixteenth issue.

VIII.  Due Process Claims

In his tenth issue, West argues that the trial court erred by refusing to allow West to testify concerning allegedly untrue statements he found in D.M.’s diary.  He claims that his right to present his own testimony is a fundamental tenant of due process and argues that the trial court’s refusal to let him offer this testimony violated his due process rights under the Texas and United States Constitutions.

To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion.  
Tex. R. App. P.
 
33.1(a)(1); 
Mosley v. State
, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998) (op. on reh’g), 
cert. denied
, 526 U.S. 1070 (1999).  Further, the trial court must have ruled on the request, objection, or motion, either expressly or implicitly, or the complaining party must have objected to the trial court’s refusal to rule.  
Tex. R. App. P. 
33.1(a)(2)
. Preservation of error is a systemic requirement that this court should review on its own motion. 
Martinez v. State
, 878 S.W.3d 504, 507 n.7 (Tex. Crim. App. 2000); 
Hughes
 
v. State
, 22 S.W.2d 142, 151 (Tex. Crim. App. 1993) (op. on reh’g), 
cert.
 
denied
, 511 U.S. 1152 (1994).

Here, West did not assert during trial that the trial court’s refusal to let him testify regarding the statement in D.M.’s diary about having “said” untrue things violated his due process rights.  Consequently, this alleged error is not preserved for our review.  We overrule issue ten.

IX.  Conclusion

Having overruled each of West’s issues, we affirm the trial court’s judgment.

SUE WALKER

JUSTICE

PANEL B: DAY, LIVINGSTON, and WALKER
, 
JJ.

PUBLISH

DELIVERED: October 2, 2003

FOOTNOTES
1:
Specifically, West claims that the following entry indicates D.M. planned to record everything that was important in her diary:

Dear diary, I’m starting on a new page because I’m going to try and start over, I’m going to write to you as much as possible.  If I’m going to do that I guess you need a name.  How does Jewl sound?  I have all ways [sic] liked that name.  I guess it sort-of fits you too.  You are sort-of like my Jewl because I keep you and treasure you because 
I write everything
 in you and tell you all my feelings and stuff.  [Emphasis added.]

2:
Specifically, West complains of the following exchange, occurring during the State’s direct examination of Dodson:

Q. [PROSECUTOR]: After that was over with, in other words, after she had come out of that interview, did you have an opportunity to talk to [D.M.]?

A.  Yes.  The social workers there both--there were two of them and they both recommended that [D.M.]--

[DEFENSE COUNSEL]: Again, Your Honor, she just can’t stand up here and just testify to whatever she believes somebody that’s not here told her.  I’m going to object on hearsay and I’d ask the Court to instruct the witness not to be testifying--

[PROSECUTOR]: Judge, the statement isn’t going to be offered for the truth of the matter.  It’s going to--the question is going to explain what her next step was with her conversation with her daughter.

[DEFENSE COUNSEL]: We’re here because of the truth of the matter, Your Honor.  That’s the only reason why they’re asking, in an effort to build their case against this man.  I object to hearsay.

[THE COURT]: Overruled.

[DEFENSE COUNSEL]: Note our exception.

3:
The trial court stated that this was the jury’s eleventh note.  The record, however, does not contain the notes and does not reflect the content of most of the earlier notes, except for one requesting that a portion of trial testimony be read.  The parities asserted at trial that this note was the second note indicating a jury deadlock.  Consequently, for purposes of our analysis, we treat this note as the second a jury-deadlock note.  

4:
A trial court’s inquiry as to a jury’s numerical division is not reversible error.  
See
 
Odom v. State
, 682 S.W.2d 445, 448 (Tex. App.—Fort Worth 1984, pet. ref’d).