COURT
OF APPEALS

                                       SECOND
DISTRICT OF TEXAS

                                                   FORT
WORTH

 

 

                                        NO.
2-06-358-CR

 

 

TROY DALE JOHNSTON                                                       APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

        FROM CRIMINAL
DISTRICT COURT NO. 1 OF TARRANT COUNTY

 

                                              ------------

 

                                             OPINION

 

                                              ------------

I.  Introduction








A jury convicted Appellant Troy Dale Johnston of
aggravated sexual assault of a child younger than fourteen years old and
assessed his punishment at confinement for life.  The trial court sentenced him accordingly, and
Johnston perfected this appeal.  In three
points, Johnston claims that the evidence is legally and factually insufficient
to support his conviction and that the trial court erred by overruling his
objection to improper jury argument by the State during its opening statement.  For the reasons set forth below, we will
affirm the trial court=s judgment.

II.  Factual Background

In the spring of 2005, Lisa Combs, the director
of the Little People=s Playhouse day care, was assisting
another employee with nap time in five-year-old E.J.=s
classroom.  E.J. is developmentally and
language delayed by about two years.[1]  As the children were lying down to nap, E.J. Apopped
her head up@ and said, AMy daddy
licked my bo-bo.@ 
Ms. Combs felt shocked and said, AI=m sorry,
honey.  What did you say?@  E.J. repeated the statement.

Gary and Michelle Horn were E.J.=s foster
parents at the time.  E.J. had been
living with them for some time.  The
assistant director of the day care was also living with the Horns, and Ms.
Combs knew this and knew the Horns personally from her experience with them at
the day care.  Consequently, when E.J.
said, AMy daddy
licked my bo-bo,@ even though E.J. did not name
the man who had Alicked her bo-bo,@ Ms.
Combs did not think she was referring to Gary Horn.  Ms. Combs agreed that she Aautomatically
assumed@ that
E.J. was not referring to Gary Horn and did not ask E.J. to whom she was
referring. 








E.J. testified after Ms. Combs.  E.J.=s entire
direct testimony is eight pages in the reporter=s
record.  E.J. was told that she was there
to talk about ATroy,@ and was
shown two anatomically correct dolls. 
She identified the body parts of the dolls and then was asked,

Q.  Has
anyone ever touched you on your vagina [sic[2]]?

A.  Yes.

Q.  Who did
that?

A.  Troy.

Q. 
Okay.  And did he touch youBwhat did
he touch you with?

A.  Tongue.

. . . .

Q.  And
what do you call this right here, E.J.?

A.  The
penis.

Q.  The
penis.  Have you ever seen anyone=s penis?

A.  (moves
head side to side.)

Q.  Never seen anyone=s penis.  Did you ever see Daddy Troy=s penis?

 








A.  Yes.

Q.  When you saw it did it stick down or stick up
or stick out?      How did it stick?

 

A.  Up.

 

Q.  It stick up? 
Did anything come out of it?

 

A.  Yes.

 

Q.  What came out of it?

 

A.  Lotion.

 

Q.  Lotion. 
What color was the lotion?

 

A.  White.

 

Q.  It was white. 
Did Daddy Troy ever put lotion on you?

 

A.  Yes.

 

Q.  Where would he put it?

 

A.  Don=t know.

 

Q.  You don=t know. 
Well, did he put it on your body?

 

A.  Yes.

 

Q.  Where on your body?

 

A.  On my arms and legs and feet and bottom and
vagina.

 

Q.  Okay. 
Now E.J., this is really important. 
Did anyone except           Daddy
Troy, ever put their tongue on your vagina?

 

A.  (moves head up and down.)








Q.  Who else did that?

 

A.  Gary.

 

Q.  Gary did that too?  Did you tell anyone Gary did that?

 

A.  Yes.

 

Q.  Who told you that Gary did that; do you
remember?

 

A.  I remember it in my brain.

 

Q.  You remember it in your brain?

 

A.  (moves head up and down.)

   

On cross-examination, E.J. testified that when
she lived with Gary and Michelle Horn she called them Daddy Gary and Momma
Michelle.  She currently lives with
Caroline Williams, her maternal aunt. 
E.J. calls Caroline Amama@ but
testified that Caroline Adoesn=t have a
daddy@ at her
house. 

E.J. testified that Caroline had been in the
courtroom and had been trying to help her say the right things.  Caroline had taught her the words vagina and
penis.  E.J. agreed several times that
Caroline did not like Daddy Troy and had told her to say bad things about Daddy
Troy.  








On cross-examination and on redirect examination,
E.J. continued to equivocate concerning the identity of the person who had
licked her. She agreed on cross-examination that Daddy Troy didn=t really
lick her and that it was Daddy Gary who had licked her.  But then on redirect, she testified that  Daddy Troy had licked her in his bedroom; her
birth mother Kathy had been present, and it had happened only once.  On recross, E.J. agreed that when she lived
with Daddy Troy, he did not allow kids in his room.  She again agreed that it was not Daddy Troy
who had licked her, but that it was Daddy Gary who had licked her. 








Donna Wright testified that she was a pediatric
nurse practitioner employed with Cook Children=s
Medical Center in Fort Worth as the clinic coordinator for the Care Team, which
is a specialized unit that sees children who have been referred to the hospital
as alleged victims of sexual abuse, physical abuse, or neglect.  On July 20, 2005, she saw E.J. as a patient;
E.J. was five years old.  Wright
testified that she had received information that E.J. was delayed
developmentally.  Wright referred to her
notes and testified that she had started E.J.=s
interview by asking whether anyone had ever touched her in a way that she didn=t like,
and that E.J. had answered Ano.@  Wright testified that this is not an uncommon
response because she is a stranger to the children.[3]  At some point during the interview, Wright
began showing E.J. anatomical drawings. 
E.J. indicatedCby pointing to the male drawingCthat she
had been touched by a male hand and by male genitalia.  Ultimately, Wright testified that 

[s]he said that she was
touched with his penis on her genital area, with his hand on her genital area,
with his penis on her anal area, and with his hand on her anal area.  She also said that he put his mouth on her
genital area, and that she put her mouth on his, that he put his mouth on her
anal area and that he rubbed on her genital area and that she had to touch his
penis and that something white came out of his penis.  Where, at that point, I asked, AWhere did that go?@ and she said Bshe pointed to her
abdomen at that point.

 

Wright testified that E.J.=s
physical exam was normal, and that she had expected it to be normal. 








Darlene Pile testified that she works for Child
Protective Services (CPS) and that in June 2004 she was assigned to investigate
the Johnston family.  On approximately
June 24, 2004, the Johnstons consented to voluntarily place their three
childrenCincluding
E.J.Cwith
relatives.  Prior to E.J.=s
placement with Appellant=s sister, Tina Hewitt, CPS, via
Ms. Pile, conducted a videotaped interview of E.J. for the purpose of making
certain that there had been no sexual abuse of E.J.  At that point, E.J. did not make an outcry of
any type of sexual abuse.  Pile testified
that E.J. appeared to be a normal child except for her developmental delay.
After the interview, Pile made a finding that there was no reason to believe
that E.J. had been sexually abused.  The
day after the interview, E.J. was voluntarily placed with Tina Hewitt.  Pile testified that visitation by the parents
after such a placement is controlled by CPS and that she did not believe at
that point that the child had unsupervised contact with Johnston.  Later in her testimony, however, Pile
testified that the policies and procedures of CPS were certainly that Johnston
was not supposed to have unsupervised contact with his children, but that she
was not present for the monitoring of all visits because it was no longer her
case; therefore, she did not have personal knowledge of whether all of the
visits were supervised or not.  In
October 2004, CPS took custody of the Johnston children; the State pointed out
in its questioning that CPS would not Aswoop in@ and
take the children unless something bad had happened.  Finally, Pile testified that it is not
uncommon for a child to make a delayed outcry, especially a child with verbal
developmental delays like E.J. 








Teresa Haney testified that she had worked for
CPS for over twelve years  and that she
became involved with the Johnston family approximately three or four months
before E.J. made her outcry at the daycare. 
She was asked whether in the course of her investigation the name Gary
Horn came up; she said that Mr. Horn=s name
was brought up by Kathy Johnston, not by E.J. 
Haney testified that the Johnstons terminated their rights to all of
their children, including a fourth child that had been recently born.  After defense counsel had established on
cross-examination that Jennifer Dalby was a courtesy worker assigned to E.J.
after E.J. was placed out of the area, Haney was asked,

Q.  And you
talked with Ms. Dalby, did you not?

A.  No, I
did not.

Q.  You received communications from Ms. Dalby,
did you not, ma=am?

 

A.  Not directly, no.

 

Q.  Ma=am, did you not make a complete and thorough
report of everything that was going on in the case, a log of contact and
narratives, as y=all call them?

 

A.  Yes.

Q.  And you don=t recall talking to
Jennifer Dalby at any time or receiv[ing] any e-mail from Jennifer Dalby?

 

A.  Not directly, no.

 

[objection
omitted]

 

Q.  As a matter of fact, isn=t it true that during a
visit, a supervised visit of C with Jennifer Dalby or with yourself being
present, because I=m not sure which one of
you was with E.J. at the time, but E.J. said, according to your own report,
Gary licked her bottom at a random moment during the visit.  Mr. Johnston, meaning Troy Johnston, went
ballistic.  You don=t recall anything like
that, ma=am?

 

A.  I
received an e-mail but not directly from her.

After this answer, defense counsel asked a few more questions
attempting to demonstrate CPS=s lack
of cooperation with him.  Then he passed
the witness. 








III.  Standards of Review

In reviewing the legal sufficiency of the
evidence to support a conviction, we view all the evidence in the light most
favorable to the verdict in order to determine whether any rational trier of
fact could have found the essential elements of the crime beyond a reasonable
doubt.  Jackson v. Virginia, 443
U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Hampton v. State, 165 S.W.3d
691, 693 (Tex. Crim. App. 2005).

This standard gives full play to the
responsibility of the trier of fact to resolve conflicts in the testimony, to
weigh the evidence, and to draw reasonable inferences from basic facts to
ultimate facts.  Jackson, 443 U.S.
at 319, 99 S. Ct. at 2789.  The trier of
fact is the sole judge of the weight and credibility of the evidence.  See
Tex. Code Crim. Proc. Ann. art. 38.04 (Vernon 1979); Margraves v.
State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000).  Thus, when performing a legal sufficiency
review, we may not re-evaluate the weight and credibility of the evidence and
substitute our judgment for that of the fact-finder.  Dewberry v. State, 4 S.W.3d 735, 740
(Tex. Crim. App. 1999), cert. denied, 529 U.S. 1131 (2000).  We must resolve any inconsistencies in the
evidence in favor of the verdict.  Curry
v. State, 30 S.W.3d 394, 406 (Tex. Crim. App. 2000).













When reviewing the factual sufficiency of the
evidence to support a conviction, we view all the evidence in a neutral light,
favoring neither party.  Watson v.
State, 204 S.W.3d 404, 414 (Tex. Crim. App. 2006); Drichas v. State,
175 S.W.3d 795, 799 (Tex. Crim. App. 2005). 
We then ask whether the evidence supporting the conviction, although
legally sufficient, is nevertheless so weak that the fact-finder=s
determination is clearly wrong and manifestly unjust or whether conflicting
evidence so greatly outweighs the evidence supporting the conviction that the
fact-finder=s determination is manifestly
unjust.  Watson, 204 S.W.3d at
414-15, 417; Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App.
2000).  That is, under the first Watson-prong,
we review all of the evidence weighed by the jury both for and against the
challenged finding to determine whether the proof of guilt is so obviously weak
as to undermine confidence in the jury's determination.  Johnson, 23 S.W.3d at 11.  Our review of the evidence, however, must
employ an appropriate deference to the jury=s
findings to prevent an appellate court from substituting its judgment for that
of the fact finder, and our evaluation of the evidence should not substantially
intrude upon the fact finder's role as the sole judge of the weight and
credibility given to witness testimony.  Jones,
944 S.W.2d at 648. The degree of deference we are to provide to the jury=s
findings must be proportionate with the facts we can accurately glean from the
trial record.  Johnson, 23 S.W.3d
at 8.  A factual sufficiency analysis can
consider only those few matters bearing on credibility that can be fully
determined from a cold appellate record. 
Id.  Such an approach
occasionally permits some credibility assessment but usually requires deference
to the jury's conclusions based on matters beyond the scope of the appellate
court's legitimate concern.  Id.  








In determining whether the evidence is factually
insufficient to support a conviction that is nevertheless supported by legally
sufficient evidence, it is not enough that this court Aharbor a
subjective level of reasonable doubt to overturn [the] conviction.@  Id. 
We cannot conclude that a conviction is clearly wrong or manifestly
unjust simply because we would have decided differently than the jury or
because we disagree with the jury=s
resolution of a conflict in the evidence. 
Id.  We may not simply
substitute our judgment for the fact-finder=s.  Johnson, 23 S.W.3d at 12; Cain v.
State, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997).  Unless the record clearly reveals that a
different result is appropriate, we must defer to the jury=s
determination of the weight to be given contradictory testimonial evidence
because resolution of the conflict Aoften
turns on an evaluation of credibility and demeanor, and those jurors were in
attendance when the testimony was delivered.@ Johnson,
23 S.W.3d at 8.  Thus, we must give due
deference to the fact-finder=s
determinations, Aparticularly those
determinations concerning the weight and credibility of the evidence.@  Id. at 9.

IV.  Legal Sufficiency of The Evidence

The State was required to prove that Johnston
knowingly or intentionally caused the sexual organ of E.J., a child younger
than fourteen years, to contact Johnston=s
mouth.  See Tex. Pen. Code Ann. '22.021(a)(1)(B)(I),
(a)(2)(B) (Vernon 2006).  After reviewing
the evidence in the light most favorable to the verdict, it is clear that a
rational trier of fact could have found the essential elements of the crime beyond
a reasonable doubt; as set forth above, E.J. testified concerning each element
of the offense, and her testimony alone constitutes legally sufficient evidence
to support Johnston=s conviction.  See, e.g., May v. State, 139 S.W.3d 93,
97 (Tex. App.CTexarkana 2004, pet. ref=d)
(noting testimony of child victim alone is sufficient to support conviction for
sexual assault); West v. State, 121 S.W.3d 95, 111 (Tex. App.CFort
Worth 2003, pet. ref=d) (same); Empty v. State,
972 S.W.2d 194, 196 (Tex. App.CDallas
1998, pet. ref'd) (same).  We overrule
Johnston=s first
point.

V.  Factual Sufficiency of The Evidence








Here, the element of the offense challenged by
Johnston is the requirement that the State prove that heCas
opposed to someone elseCsexually assaulted E.J.[4]  The only evidence presented to the jury to
establish that it was Johnston who sexually assaulted E.J. was E.J.=s own
testimony; as set forth above, E.J. equivocated concerning whether it was Daddy
Troy or Daddy Gary who had sexually assaulted her.  But the resolution of this conflict in E.J.=s
testimony is one that requires great deference from this court.  We were not in the courtroom when E.J.
testified, we did not see her demeanor, and we did not hear the intonation or
inflection in the questions asked to her and answered by her.  Additionally, although the record reflects
that E.J. is developmentally delayed, the cold record before usCas
opposed to her live testimony provided to the juryCprovides
us with no insight as to how this developmental delay impacted her
testimony.  In short, giving due
deference to the jury=s resolution of this conflict in
E.J.=s
testimony, and viewing all of the other evidence in a neutral light, the proof
of Johnston=s guilt is not so obviously weak
as to undermine our confidence in the jury's determination.  Johnson, 23 S.W.3d at 11.













Moving to our analysis under the second Watson-prong,
we examine all of the evidence in a neutral light to determine whether the
conflicting evidence so greatly outweighs the evidence supporting the
conviction that the fact-finder=s
determination is manifestly unjust.  Watson,
204 S.W.3d at 414-15, 417; Johnson, 23 S.W.3d at 11.  The evidence supporting the jury=s
finding, as set forth above, is E.J.=s
testimony that Johnston licked her with his tongue inside her vagina in his
bedroom.[5]  The evidence that conflicts with the jury=s
finding that Johnston was the perpetrator of a sexual assault against E.J. is
E.J.=s
equivocal testimony that Johnston both did and did not lick her, that Daddy
Gary both did and did not lick her, Darlene Pile=s
testimony that in a June 2004 videotaped interview conducted the day before
E.J. was voluntarily placed outside Johnston=s homeCconducted
for the purpose of determining whether E.J. had suffered any sexual abuseCE.J. did
not make an outcry concerning any sexual abuse, and Teresa Haney=s
testimony that Kathy Johnston called CPS on several occasions and indicated
that she believed Gary Horn was the perpetrator.[6]  Pile, however, on redirect examination
explained that even though E.J. had been voluntarily placed with Johnston=s sister
and unsupervised visits should not have occurred, she had no idea whether they
did in fact occur.  Pile and nurse practitioner
Donna Wright both testified that a delayed outcry is not unusual in a young
child.  And Haney testified that Kathy
Johnston called CPS concerning Gary Horn only after her husband had been
charged with the offense.  

Thus, in summary, Johnston offered evidence that
E.J. had not been sexually assaulted prior to June 2004 and that he did not
have access to E.J. after June 2004.  The
State countered Johnston=s evidence with evidence that
E.J. may have been sexually assaulted prior to June 2004 but made a delayed
outcry, that E.J. may have been sexually assaulted after June 2004, and that
Johnston did have access to E.J. prior to June 2004 and may have had access to
her after June 2004.  








To reverse under the second Watson-prong,
we must determine, with some objective basis in the record, that the great
weight and preponderance of all the evidence, though legally sufficient,
contradicts the verdict.  Watson,
204 S.W.3d at 417.  Here, no objective
basis in the record exists for concluding that the great weight and
preponderance of the evidence contradicts the verdict.  To the contrary, the jury could have resolved
the conflicts in E.J.=s testimony and the other
evidence consistently with its finding that Johnston was the perpetrator of a
sexual assault against E.J.

We overrule Johnston=s second
point.

VI.  Argument During Opening Statement

In his third point, Johnston argues that the
trial court erred by overruling defense counsel=s
objection to a portion of the State=s
opening statement.  The record reflects
the following exchange:

[Prosecutor]: I hope she
finds the courage in her to tell you what happened.  That=s my hope. 
I can=t count on it because she=s six.  But I hope y=all get to hear her talk
because she did tell people along the way who ignored it, including her
mother.  Her mother, who chose to ignore
her outcries before she got in foster care. 
Her mother, who chose to give up all four of her children that she had
to stay with this man.  Her mother who
called CPS repeatedly to try to muddy the watersC

 

[Defense Counsel]: Excuse
me, Your Honor.  I am going to object to
this being argument as opposed to opening statement.

 

[The Court]: Overruled.

 

[Prosecutor]: Thank you,
Your Honor.  Her mother, who repeatedly
called CPS and tried to muddy the waters and give new suspects and new details,
that never came from [E.J.], that came from Kathy Lewis Johnston.

 

 Teresa
Haney ultimately did testify that Kathy Johnston had called CPS and had
indicated her belief that Gary Horn was the perpetrator.








The prosecutor=s above
quoted comment during opening statement was a proper statement of a fact that
the prosecution in good faith expected to and did prove.  See Tex.
Code Crim. Proc. Ann. art. 36.01(a) (Vernon 2007); Parra v. State,
935 S.W.2d 862, 871 (Tex. App.CTexarkana
1996, pet. ref=d).  The trial court did not abuse its discretion
by overruling Johnston=s objection to this
argument.  Accord Banks v. State,
643 S.W.2d 129, 133 (Tex. Crim. App. 1982), cert. denied, 464 U.S. 904
(1983).  We overrule Johnston=s third
point.

VII.  Conclusion

Having overruled each of Johnston=s three
points, we affirm the judgment of the trial court.

 

SUE
WALKER

JUSTICE

 

PANEL B: DAUPHINOT,
GARDNER, and WALKER, JJ.

 

PUBLISH

 

DELIVERED: July 12, 2007











[1]Ms. Combs testified that
although E.J. was five years old at the time, she was Amentally, maybe three.@  In response to the question, A[i]t=s true, isn=t it, that you are
basically dealing with a child who is developmentally three years old,
mentally?,@ she answered, AThat would be very close
to what I think.@ 





[2]See Tyler v. State, 950 S.W.2d 787, 789
(Tex. App.CFort Worth 1997, no pet.)
(Dauphinot, J., pointing out the anatomically correct usage of the word
vagina).

                                                    





[3]After defense counsel
objected to Wright=s testimony on hearsay
grounds, the State contended that the testimony fell within the hearsay
exception for statements provided for medical diagnosis and treatment.  Following a voir dire of Wright outside the
presence of the jury, the trial court ruled that Wright=s testimony Aregarding who [licked]
and where [the licking occurred]@ was hearsay and not admissible.  





[4]The record before us
contains a large amount of evidence that E.J. was sexually assaulted; the point
Johnston raises on appeal challenges the evidence that Johnston was the person
who committed the offense.





[5]In addition to this
evidence, the State points to much evidence that does establish a sexual
assault occurred, including that E.J. knew a penis pointed up and saw a white
discharge come from a penis.  This
evidence, while clearly constituting evidence that E.J. suffered a sexual
assault, does not weigh either for or against the identity element of the
offense challenged by Johnston. 





[6]Although Teresa Haney
testified that she had received an email, defense counsel=s question to her
regarding E.J.=s alleged comment that
Daddy Gary had Alicked her bo-bo@ is not evidence, and
counsel did not ask further questions on this issue, so we do not include it in
our analysis.  Accord Rodriguez
v. State, No. 01-05-00032-CR, 2006 WL 648859, at *8 (Tex. App.CHouston [1st Dist.] Mar.
16, 2006, pet. ref=d) (mem. op.) (not
designated for publication).