

# COURT OF APPEALS
### SECOND DISTRICT OF TEXAS
### FORT WORTH

### NO. 2-08-021-CR

STEPHEN MOLE                                          APPELLANT

V.

THE STATE OF TEXAS                                          STATE

------------

### FROM THE 16TH DISTRICT COURT OF DENTON COUNTY

------------

## MEMORANDUM OPINION[1]

------------

## I. INTRODUCTION

A jury found Appellant Stephen Mole guilty of intoxication manslaughter (count I) and intoxication assault (counts II and III), assessed his punishment at twenty years' imprisonment for count I and ten years' imprisonment for counts II and III, and recommended that the sentence for count II be suspended and that Mole be placed on probation. The trial court entered judgment and sentenced Mole accordingly, ordering that the sentences for counts I and III run

---

[1] *See* Tex. R. App. P. 47.4.

consecutively and that the sentence for count II run concurrently. In nine points, Mole argues that the trial court erred by excluding certain evidence at the guilt-innocence stage of his trial, by refusing to submit lesser included offense and causation instructions to the jury, and by admitting certain victim impact and character evidence at the punishment stage of trial. We will affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Members of two New Hampshire families, the Cordeses and the Gateses, visited Texas to attend a wedding. Around 10:00 p.m. on the night of the wedding, they decided to leave the wedding reception and return to their hotel. Gene Cordes drove their rental car, and his friend Don Gates sat in the front passenger seat. Gene's wife Beverly Brooks, their son Griffin Cordes, and Don's wife Marilyn Gates sat in the backseat. Gene was driving south on Marsh Lane near Carrollton. As he approached the intersection of Marsh Lane and Hebron Parkway, the left turn arrow turned green, and he began executing a left-hand turn onto Hebron.

Mole was driving his Ford Expedition west on Hebron and ran the red light at the intersection, colliding with Gene's rental car. The rental car spun out of control, and Marilyn and Beverly were thrown from the car. Marilyn died at the hospital that night. Griffin and Beverly both spent several days in the hospital receiving treatment for their injuries and continued to have medical difficulties

2

stemming from the accident through the date of trial. A grand jury ultimately indicted Mole for one count of intoxication manslaughter and two counts of intoxication assault.

At trial, six eyewitnesses testified for the State. The driver and two passengers of a Lincoln Navigator that was heading west on Hebron testified that Mole sped past them and never applied his brakes before colliding with the rental car. All three of those witnesses testified that the light on Hebron was red when Mole entered the intersection. Tim Raine and his fiancé, who were also heading west on Hebron that night, testified that Mole passed them while driving at a high speed and that he swerved in and out of lanes. They approached the intersection of Hebron and Marsh as the collision was happening. Raine testified that the light was red when he saw the accident and that Mole "appeared to run a red light." Laurel Jentgen, the sixth eyewitness to testify for the State, explained that she had been driving north on Marsh that night and had just received a green left turn arrow and executed a left hand turn to head west on Hebron when she heard the crash behind her.

Officer Brian Vannucci of the Carrollton Police Department was the first officer on the scene. He testified that Mole smelled of alcohol and that his eyes were red and watery, but he explained on cross-examination that the air bags in Mole's vehicle had deployed and that this would cause a driver's eyes to

3

redden. Mole was able to carry on a conversation with the officer and told the officer that he had consumed three to four glasses of wine that evening. Former state trooper Chris Van Dyk,[2] the primary investigator for the accident, testified that he also spoke with Mole when he arrived at the scene. He noticed that Mole walked in a normal fashion but that his breath smelled of alcohol. Van Dyk conducted sobriety tests on Mole, determined that he was intoxicated, and arrested him.

Officer Jeff Heinemeyer of the Carrollton Police Department testified that approximately two and a half hours after the accident, he spoke with Mole at the hospital and noticed that Mole's breath had a faint odor of alcohol and that his eyes were glossy and bloodshot. At the hospital, Mole consented to a blood test, and the lab results showed that his blood contained 0.12 grams of alcohol per 100 milliliters of blood.[3]

Michael Brighton testified as Carrollton's supervisor of traffic operations. He explained that the traffic lights at the intersection of Marsh and Hebron were working normally on the date of the accident. He explained that it is impossible for traffic on Hebron to have a green light while traffic on Marsh also has a

---

[2] Because Van Dyk was no longer a state trooper at the time of trial, we do not refer to him by this title.

[3] *See* Tex. Penal Code Ann. § 49.01(2)(B) (Vernon 2006) (defining intoxication as having an alcohol concentration of 0.08 or more).

4

green left turn arrow and that any malfunctioning of the lights results in flashing red lights for all traffic stopped in any direction at the intersection.

The defense called Mole's long-time friend June Wise, who testified that she received a call from Mole around 10:00 or 10:30 that night and that Mole sounded concerned but otherwise normal. Mole's sister testified that she ate dinner with Mole and their parents at a restaurant that night and that Mole drank wine at dinner, but she did not know how much. She said that Mole seemed fine when they left the restaurant. The defense also called eyewitness Gloria Castillo to testify; she read from the affidavit she wrote the night of the accident that Mole's vehicle "was speeding to make the light when it was turning red." She further testified that Mole's light was red when he entered the intersection and that she did not see him apply his brakes. Castillo also testified that before the accident, Mole almost hit her car and that she had to move out of his way.

### III. EVIDENCE

In his first, second, fifth, sixth, and seventh points, Mole argues that the trial court abused its discretion by excluding certain evidence at trial. In his eighth and ninth points, he argues that the trial court abused its discretion by admitting certain evidence at the punishment stage of trial. We will address each of these arguments below.

5

**A. Standard of Review**

We review a trial court's decision to admit or to exclude evidence under an abuse of discretion standard. *Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000); *see Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003). A trial court does not abuse its discretion as long as the decision to admit or to exclude the evidence is within the zone of reasonable disagreement. *Montgomery v. State*, 810 S.W.2d 372, 380 (Tex. Crim. App. 1990) (op. on reh'g).

**B. Exclusion of Hearsay Statements**

In his first and second points, Mole argues that the trial court abused its discretion by refusing to allow him to cross-examine Officer Heinemeyer about, and introduce a videotape of, Officer Heinemeyer's remarks to Officer Van Dyk concerning certain unknown witnesses' comments to Officer Heinemeyer at the scene.

*1. The Excluded Evidence*

The seven eyewitnesses who testified at trial also wrote affidavits on the night of the accident detailing what they saw, and these affidavits were admitted into evidence at trial. A videotape from the scene demonstrated that at one point Officer Heinemeyer remarked to Officer Van Dyk,

6

"Three people that are over here, uh, I don't know what you want from them other than these affidavits but they are sitting here. None of, none of the three are very intelligent individuals, which is about par for the course, but, uh, they're saying the light was yellow going to red when he made his turn . . . the Expedition."

Officer Heinemeyer then said, "And so what I was hearing from them is that they were guaranteeing it was red. So, I don't—you know how that goes."

About eleven minutes following this statement, Officer Heinemeyer asked Van Dyk if he "still needs these other witnesses over here?" Van Dyk said that the witnesses could leave and that he had "plenty of witness statements."

Mole's first trial ended in a mistrial. During that trial, the trial court ruled that no hearsay statements regarding the color of the stop light would be admissible before the jury. Before Mole's second trial, the trial court adopted for the second trial all of its pretrial rulings and all agreements as if the mistrial did not occur.

At Mole's second trial, the following exchange took place between the prosecutor and Officer Heinemeyer on direct examination:

Q  Now, at any point, did you have any contact with any civilians [at the scene] that said, ["]Hey, I saw the crash?["]

A  Yes, I did.

Q  At what point during your stay here on the crash scene did you encounter those people?

7

A  Several times throughout my stay.  The initial stay when I was laying the flare line, people were coming up and saying, ["]I saw the accident; I saw what happened.["]  Several different things people said that would indicate they saw what took place.

    . . . .

Q  Now, as far as the witnesses are concerned, did you ever provide them a witness statement, anything paper-wise to write down their statement?

A  Yes, I did.

Q  Do you recall, what, if anything, you told them to put in that statement?

    . . . .

A  It was one person that came up.  I handed him a stack of affidavits and said, ["]What I need is for the top portion to be filled out and a narrative portion put in there, where you were, and what you saw . . . .["]  A lot of them were in a hurry, and so they wanted to go ahead and start on the affidavits.  And then they actually approached me at the back of my car as I was getting more flares.  We stopped traffic, got them across.  I don't know if it was a male or female.  It was one of the witnesses that walked off with a stack of affidavits.

Q  Did you tell them to go to a particular location to do this?

A  Yes.

Q  Where did you corral them?

A  In the northeast corner of the 7-Eleven parking lot.

8

During cross-examination, the defense attempted to elicit testimony from Officer Heinemeyer concerning the conversations and interactions the officer had with the witnesses who said that the light was yellow going to red:

Q Because you were asked by the State of Texas just a minute ago, the government asked you, [")Did people say, [']hey, I just witnessed a crash.['"]  Do you remember when the government's attorney just asked you that?

A Yes, I do.

Q In fact, some of the people that came up to you said, [")Hey, the light was yellow–["]

The State then objected, and the trial court held a hearing outside the jury's presence, at which time the State argued that the question sought inadmissable hearsay and that the trial court had ruled previously that what certain unknown witnesses had told Officer Heinemeyer at the scene was inadmissible hearsay. During the hearing, Officer Heinemeyer agreed that he had told Van Dyk that some people had approached him "at the very end, after I started collecting witness affidavits," and had told him that the light "was yellow going to red." The trial court ruled that it would stand by its original ruling excluding evidence of what these unidentified witnesses told Officer Heinemeyer.[4] Ultimately, the

_____

[4] The trial court noted that any issue with double hearsay was resolved when Officer Heinemeyer took the stand and identified his voice on the videotape but that the underlying hearsay issue remained regarding statements made by unknown witnesses to Officer Heinemeyer.  *See* Tex. R. Evid. 801.

9

videotape recording was admitted into evidence and played for the jury with this audio portion muted.

### 2. No Due Process or Confrontation Clause Violation

In his first point, Mole argues that the exclusion of the above evidence violated his due process right to present a defense. *See* U.S. Const. amend. VI, XIV.

In some instances, the exclusion of a defendant's evidence can amount to a violation of the right to compel the attendance of witnesses in the defendant's favor. *Williams v. State*, 273 S.W.3d 200, 232 (Tex. Crim. App. 2008) (citing *Potier v. State*, 68 S.W.3d 657, 659 (Tex. Crim. App. 2002)). The Sixth Amendment, made applicable to the states through the Fourteenth Amendment, is a firm guarantor of the constitutional assurance of compulsory process to obtain favorable witnesses. *Id.* (citing *Washington v. Texas*, 388 U.S. 14, 87 S. Ct. 1920 (1967)). When an application of the evidentiary rules would be "'fundamentally unfair'" or constitutional rights directly affecting the ascertainment of guilt are implicated, the rules "'may not be applied mechanistically to defeat the ends of justice.'" *Id.* (quoting *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S. Ct. 1038, 1049 (1973)). In other words, in an appropriate case, evidentiary rules, like those prohibiting hearsay, should yield to constitutional protections. *Id.* But this does not mean that

10

every erroneous exclusion of a defendant's evidence amounts to a constitutional violation. *Id.*

Evidentiary rulings rarely rise to the level of denying the fundamental constitutional right to present a meaningful defense. *Potier*, 68 S.W.3d at 659. There are two distinct scenarios in which rulings excluding evidence might rise to the level of a constitutional violation: (1) when a state evidentiary rule categorically and arbitrarily prohibits the defendant from offering otherwise relevant, reliable evidence that is vital to his defense; and (2) when a trial court's clearly erroneous ruling excluding otherwise relevant, reliable evidence that forms such a vital portion of the case effectively precludes the defendant from presenting a defense. *Id.* at 659–62; *Wiley v. State*, 74 S.W.3d 399, 405 (Tex. Crim. App.), *cert. denied*, 537 U.S. 949 (2002). In the first scenario, "the constitutional infirmity is in the arbitrary rule of evidence itself." *Wiley*, 74 S.W.3d at 405. In the second scenario, "the rule itself is appropriate, but the trial court erroneously applies the rule to exclude admissible evidence to such an extent that it effectively prevents the defendant from presenting his defensive theory." *Id.*

Here, Mole does not claim that Officer Heinemeyer's testimony and his videotaped statements to Van Dyk regarding what certain unknown witnesses told him fall under an exception to the hearsay rule; rather, he contends that the

exclusion of this evidence effectively precluded him from presenting a defense. *See Potier*, 68 S.W.3d at 659–62.  Mole heavily relies on our sister court's opinion in *Alonzo v. State* to support his argument.  *See* 67 S.W.3d 346, 358–62 (Tex. App.—Waco 2001, pet. dism'd).

In *Alonzo*, the Waco Court of Appeals noted that factors to consider in determining whether otherwise inadmissible evidence should be admitted because of due process concerns include (1) the inherent trustworthiness of the hearsay; (2) any corroborating evidence that the hearsay is truthful; (3) the hearsay's importance to the determination of guilt-innocence; (4) the State's opportunity to examine the declarant of the hearsay; and (5) the State's demonstration, if any, of the unreliability of the hearsay. *Id.* at 359–60.  The excluded evidence in *Alonzo* included a videotaped statement by a person who claimed to have been an eyewitness to the killing and said that someone other than the defendant had committed the crime and statements by four others corroborating and supporting the alleged eyewitness's story of the murder. *Id*. at 356.  The court of appeals held that the trial court erred by excluding this evidence in violation of Alonzo's due process right to present his "alternative perpetrator" defense. *Id.* at 361–62.

In this case, the statements made by the unknown witnesses to Officer Heinemeyer were trustworthy to the extent that they were made to a police

12

officer shortly after the accident, but they were not corroborated by any other evidence, were not against the speaker's interest (in fact, we do not even know the speaker), and were not directly exculpatory to Mole (in fact, Officer Heinemeyer's recitation of the witnesses' statements that "the light was yellow going to red when he made his turn . . . the Expedition," is factually incorrect and confusing because Mole, who was driving the Expedition, did not turn at the intersection). *See, e.g.*, *Chambers*, 410 U.S. at 300, 93 S. Ct. at 1048 (holding that statements provided considerable assurance of reliability when spontaneously made to a close acquaintance shortly after the incident, corroborated by some other evidence in the case, and made against declarant's interest). Unlike in *Alonzo*, the videotape here shows that the statements were conveyed by a third person (Officer Heinemeyer) who recounted what the witnesses said, possibly distorting their actual statements. *See Alonzo*, 67 S.W.3d at 360 ("[C]ompared with the usual case in which hearsay is conveyed at trial by a third-person who recounts what the declarant said, this hearsay is recounted by the declarant . . . thus eliminating any distortions by a third-person."). And unlike in *Alonzo*, the videotape here did not record the unknown witnesses telling Officer Heinemeyer that the light was yellow, nor did it show Officer Heinemeyer when he relayed to Van Dyk what these witnesses had told

13

him,[5] thus preventing the trial court from observing Officer Heinemeyer's or the unknown witnesses' demeanors to aid in any credibility determination. *See id.*

On the videotape, immediately after Officer Heinemeyer told Van Dyk that some witnesses had said "the light was yellow going to red *when he made his turn . . .* the Expedition," he said, "*[T]hey were guaranteeing it was red.*" [Emphasis added.]  Even Mole points out on appeal the conflicting nature of these statements, acknowledging that "[o]ne assumes the witnesses are referring to [Mole's] light; however, it is also possible that they were referring to Gene Cordes' light."  If the witnesses were referring to Mole's Expedition, they were guaranteeing his light was red.  If they were referring to Gene's rental car, these statements are unsupported by any other evidence.  The unclear nature of Officer Heinemeyer's remarks to Van Dyk adds to the unreliability of the witnesses's hearsay statements. *See Stevens v. State*, 234 S.W.3d 748, 788 (Tex. App.—Fort Worth 2007, no pet.) (holding that excluded statement that defendant had hit child lacked indicia of reliability because it was unclear whether declarant's statement referred to spanking the children on occasion).

---

[5] Officer Heinemeyer identified himself as the speaker on the videotape at trial, but his face is not on the videotape.

14

As further evidence of the unreliability of these hearsay statements, unchallenged evidence established that neither Gene Cordes nor Laurel Jentgen could have had green lights unless Mole's light had been red for two seconds.[6] Moreover, five eyewitnesses who were traveling in the same direction and on the same road as Mole that night testified that Mole entered the intersection while the light was red. In light of the evidence that Mole ran the red light on Hebron, we cannot say that the hearsay statements of unknown witnesses recounted by Officer Heinemeyer are inherently trustworthy. *See Alonzo*, 67 S.W.3d at 360; *see also Hall v. State*, No. 05-04-01313-CR, 2005 WL 1706304, at *3 (Tex. App.—Dallas July 22, 2005, no pet.) (not designated for publication) (considering the lack of trustworthiness in the offered testimony and the testimony's contradiction with the substantial amount of evidence showing appellant's guilt in holding that trial court did not abuse its discretion by prohibiting testimony).

In an effort to show that the hearsay statements were corroborated by other evidence, Mole points to Gloria Castillo's statement in her affidavit that

---

[6] Gene and Jentgen testified that they had green left turn arrows to turn left onto Marsh, and other testimony demonstrated that that this would have been impossible if Mole also had a green light on Hebron. Testimony further showed that the light on Hebron is illuminated yellow for four seconds before turning red and is illuminated red for two more seconds before the light for Marsh turns green.

15

Mole "was speeding to make the light when it was turning red," as well as evidence that there had been "some complaint about the cycling of the lights at the intersection only the day before the incident." But Castillo did not swear in her affidavit that Mole did not run the red light; instead, she simply stated that he was speeding to make the light when it was turning red. At trial, Castillo further explained the statement in her affidavit. She testified affirmatively that the light was red when Mole entered the intersection.

The purported complaint about the cycling of the lights at the intersection likewise does not corroborate the proffered hearsay. Brighton, Carrollton's supervisor of traffic operations, testified that the day before the accident a citizen complained that the light on Marsh "was taking too long to change to green from a red color." He stated that an employee "did a full check of the signal" and determined that the stop lights were functioning properly. Thus, the evidence cited by Mole is not corroborative of the hearsay statements, and we find no other evidence in the record to corroborate them. *See Alonzo*, 67 S.W.3d at 360.

Mole next argues that his sole defensive theory was causation and that, consequently, the hearsay evidence that the light was "yellow going to red" was very important to his defense. The exclusion of this hearsay, however, did not thwart Mole's ability to present a defense. *See Wiley*, 74 S.W.3d at 408

16

(holding that exclusion of evidence precluded appellant "from presenting *some* of his evidence that *perhaps* Mr. Thomas was *somehow* involved in the commission of this arson" but did not preclude appellant from presenting defense). In his defense, Mole presented evidence that Van Dyk, the primary investigator, conducted a shoddy investigation, is untrustworthy, and is no longer a state trooper. Mole's sister testified that Mole ate dinner with her and their parents immediately prior to the accident, that he drank wine with dinner, and that he "seemed fine" when they left the restaurant. She was not concerned about Mole driving their parents and himself home. Mole's longtime friend also testified that she received a call from Mole around the time of the accident and that his speech was normal.

The trial court's exclusion of the hearsay at issue did not deny Mole the fundamental constitutional right to present a meaningful defense. *See Potier*, 68 S.W.3d at 663. For the above reasons, we hold that the trial court's exclusion of Officer Heinemeyer's videotaped statements to Van Dyk and his testimony that some people told him that the light was yellow going to red did not violate Mole's due process rights. *See Stevens*, 234 S.W.3d at 788; *Hall*, 2005 WL 1706304, at *3.

17

### 3. No Violation of Rule of Optional Completeness

In his second point, Mole argues that the trial court violated Texas Rule of Evidence 107 by prohibiting him from introducing the same evidence at issue in his first point.  *See* Tex. R. Evid. 107.  Specifically, he argues that because Officer Heinemeyer testified on direct examination that several individuals told him that they saw the accident occur, the rule of optional completeness allowed evidence of what those individuals told the officer, i.e., that the light was "yellow going to red."

Rule 107 provides that

[w]hen part of an act, declaration, conversation, writing or recorded statement is given in evidence by one party, the whole on the same subject may be inquired into by the other, and any other act, declaration, writing or recorded statement which is necessary to make it fully understood or to explain the same may also be given in evidence, as when a letter is read, all letters on the same subject between the same parties may be given.

*Id.*

This rule is one of admissibility and permits the introduction of otherwise inadmissible evidence when that evidence is necessary to fully and fairly explain a matter "opened up" by the adverse party.  *Walters v. State*, 247 S.W.3d 204, 218 (Tex. Crim. App. 2007); *West v. State*, 121 S.W.3d 95, 103 (Tex. App.—Fort Worth 2003, pet. ref'd).  It is designed to reduce the possibility of the jury receiving a false impression from hearing only a part of some act,

18

conversation, or writing, and it takes effect when other evidence has already been introduced but is incomplete or misleading. *Walters*, 247 S.W.3d at 218; *West*, 121 S.W.3d at 103. Once an evidentiary door has been opened by one side, this rule serves to allow the other side to complete the picture. *West*, 121 S.W.3d at 103. Rule 107 does not permit the introduction of other similar but inadmissible evidence unless it is necessary to explain properly admitted evidence. *Walters*, 247 S.W.3d at 218. Further, the rule is not invoked by the mere reference to a document, statement, or act. *Id.* And it is limited by rule 403, which permits a trial judge to exclude otherwise relevant evidence if its unfair prejudicial effect or its likelihood of confusion of the issues substantially outweighs its probative value. *Id.*; *see* Tex. R. Evid. 403.

Here, Officer Heinemeyer's testimony that people at the scene said they saw what happened did not leave a false impression with the jury, and the excluded statements were not necessary to fully understand the officer's testimony; he further testified that people were approaching him while he was laying the flare line on the scene and that he gave one person a stack of affidavits so that witnesses could begin writing down what they saw. *See Walters*, 247 S.W.3d at 218; *West*, 121 S.W.3d at 103. Mole argues that the excluded evidence was necessary because the State left a false impression that "all the statements made by persons at the scene were supportive of the light's

19

being red." But Van Dyk testified that he did not talk to every witness on the scene, thus informing the jury that not all witnesses testified at trial.

We hold that the trial court's decision to exclude the statements at issue did not violate rule 107's doctrine of optional completeness and that, consequently, the trial court did not abuse its discretion by excluding Officer Heinemeyer's testimony about these statements. *See Walters*, 247 S.W.3d at 217; *West*, 121 S.W.3d at 100.

### 4. Harmless Error

Finally, even assuming *arguendo* that the trial court abused its discretion by excluding this evidence, and even assuming that this rose to the level of a constitutional error, we apply rule 44.2(a) and hold that any such error was harmless beyond a reasonable doubt. *See* Tex. R. App. P. 44.2(a); *Williams v. State*, 958 S.W.2d 186, 194 (Tex. Crim. App. 1997); *see also Alonzo*, 67 S.W.3d at 362 (applying rule 44.2(a) to error in admissibility of evidence when error violated defendant's due process right to present a defense). In applying the "harmless error" test, our primary question is whether there is a "reasonable possibility" that the error might have contributed to the conviction. *Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g), *cert. denied*, 526 U.S. 1070 (1999).

Our harmless error analysis should not focus on the propriety of the outcome of the trial; instead, we should calculate as much as possible the probable impact on the jury in light of the existence of other evidence. *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000), *cert. denied*, 532 U.S. 944 (2001). We consider the source and nature of the error, the extent that it was emphasized by the State, its probable collateral implications, the weight a juror would probably place on the error, and whether declaring it harmless would be likely to encourage the State to repeat it with impunity. *Harris v. State*, 790 S.W.2d 568, 587 (Tex. Crim. App. 1989). This requires us to evaluate the entire record in a neutral, impartial, and even-handed manner, not "in the light most favorable to the prosecution." *Id.* at 586.

Here, evidence that three individuals told Officer Heinemeyer that the light was "yellow going to red when he made the turn" would have helped Mole's causation defense, but we cannot say that there is a "reasonable possibility" that the error, if any, in excluding this evidence might have contributed to the conviction. *See Mosley*, 983 S.W.2d at 259. The jury heard eyewitness testimony that Mole was speeding and swerving in and out of lanes prior to the accident, that the light was red when Mole entered the intersection, and that Mole never applied his brakes before colliding into Gene's rental car. Gene and Jentgen both testified that they received green turn arrows before turning left

21

onto Hebron from Marsh, and evidence at trial showed that it would have been impossible for traffic on Marsh to have green turn arrows at the same time that traffic on Hebron had a green light. Eyewitness Castillo wrote in her affidavit that Mole "was speeding to make the light when it was turning red" and eyewitness Raines wrote in his affidavit that Mole "appeared to run a red light," but these statements do not contradict the evidence that the light was red. The videotape played for the jury shows Van Dyk asking Mole whether he remembered seeing a red light, to which Mole responded, "No sir, I may have. I may have looked down. I may have been distracted." Van Dyk also testified that Mole told him he did not recall applying his brakes or attempting to brake. Numerous witnesses testified that the light was clearly red when Mole entered the intersection

After assuming constitutional error, carefully reviewing the record, and performing the required harm analysis under rule 44.2(a), we alternatively conclude beyond a reasonable doubt that the trial court's refusal to admit the complained-of evidence did not contribute to Mole's conviction or punishment. *See* Tex. R. App. P. 44.2(a); *Simpson v. State*, 119 S.W.3d 262, 271 (Tex. Crim. App. 2003), *cert. denied*, 542 U.S. 905 (2004). Because we have alternatively held that the exclusion of this evidence was harmless as a constitutional error, we likewise hold it was harmless as nonconstitutional error

22

to the extent Mole also complains of its exclusion under his doctrine-of-optional-completeness argument.  *See* Tex. R. App. P. 44.2(b).  Consequently, even assuming error, we overrule Mole's first and second points.

### C.  Cross-Examination to Show Bias

In his fifth, sixth, and seventh points, Mole argues that the trial court abused its discretion by excluding evidence and prohibiting cross-examination of Van Dyk to show his bias or motive to testify in favor of the State.  Mole argues that this error violated Texas Rule of Evidence 613[7] and his right to confront witnesses under the Texas and United States Constitutions.[8]  *See* U.S. Const. amend. VI; Tex. Const. art. I, § 10; Tex. R. Evid. 613.

### *1.  Mole's Proffered Evidence*

Prior to the mistrial in Mole's first trial, the defense attorney sought to admit a written complaint investigation of Van Dyk's job performance from the Texas Highway Patrol (the THP).  The written investigation included several allegations that Van Dyk had violated various THP policies on specific prior

---

[7] Mole incorrectly cites rule 612 in his brief, but this rule was renumbered to rule 613 in 1998.  Thus, we will refer to the current rule, rule 613.

[8] Mole combines his argument for these three points, and therefore, in our resolution of the constitutional issues, we will treat the state and federal constitutions as providing the same protections.  *See Heitman v. State*, 815 S.W.2d 681, 690–91 n.23 (Tex. Crim. App. 1991).

23

occasions when he (1) allowed his wife to ride in his official car without approval, (2) went home on several occasions when he should have been at work, (3) failed to check his car radio during that time period, (4) falsely documented the hours he worked in weekly reports, (5) failed to investigate or respond to specific accidents, and (6) failed to assist co-workers with patrol duties when requested on at least four occasions. The report included a recommendation that Van Dyk be discharged.

The trial court held a hearing outside the jury's presence in which the defense attorney made an offer of proof, questioning Van Dyk. During the offer of proof, the defense attorney asked Van Dyk if he agreed that some of the allegations against him were crimes. Based on this questioning, the trial court stopped the proceedings and appointed counsel for Van Dyk. After consulting with an attorney, Van Dyk answered most of the questions regarding the investigation against him, but he invoked his Fifth Amendment privilege when questioned about falsifying time sheets. He testified that he was not aware of any current investigation against him based on this allegation and that the State did not offer him any type of immunity for his testimony in this case.

At a pre-trial hearing in Mole's second trial, his defense attorney re-urged the admission of the written investigation and cross-examination of Van Dyk on these allegations as evidence of Van Dyk's bias or motive to testify for the

State.  The trial court ruled that its prior ruling would stand and refused to admit the evidence.

## 2. Prior Statements Showing Bias

The Sixth Amendment and Texas Rule of Evidence 613 protect a defendant's right to cross-examine a witness regarding bias or motive. *See* U.S. Const. amend. VI; Tex. R. Evid. 613(b) (describing the procedure for impeaching a witness by proof of circumstances or statements showing bias or interest on the part of such witness); *Davis v. Alaska*, 415 U.S. 308, 315–17, 94 S. Ct. 1105, 1110–11 (1974).  A defendant is entitled to pursue all avenues of cross-examination reasonably calculated to expose a motive, bias, or interest for the witness to testify. *Carpenter v. State*, 979 S.W.2d 633, 634 (Tex. Crim. App. 1998); *Carroll v. State*, 916 S.W.2d 494, 497 (Tex. Crim. App. 1996).  But the trial court has broad discretion to limit cross-examination in order to avoid harassment, prejudice, confusion of the issues, endangering the witness, the injection of cumulative or collateral evidence, and marginally relevant interrogation. *Carpenter*, 979 S.W.2d at 634; *Lagrone v. State*, 942 S.W.2d 602, 613 (Tex. Crim. App.), *cert. denied*, 522 U.S. 917 (1997).  The trial court exceeds its discretion only when it prohibits a defendant from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of a witness. *Felan v. State*, 44 S.W.3d

25

249, 254 (Tex. App.—Fort Worth 2001, pet. ref'd) (citing *Lagrone*, 942 S.W.2d at 613).

The United States Supreme Court has established the appropriate three-prong analysis for determining whether a denial of the Sixth Amendment Confrontation Clause right of cross-examination is harmless error. *See Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S. Ct. 1431, 1438 (1986). Initially, under the first prong, we must assume that the damaging potential of the cross-examination was fully realized. *Id.*; *Shelby v. State*, 819 S.W.2d 544, 550–51 (Tex. Crim. App. 1991). Under the second prong, we then must perform our review under these factors: (1) whether the witness's testimony was important to the prosecution's case; (2) whether the testimony was cumulative; (3) whether there was evidence corroborating or contradicting the testimony of the witness on material points; (4) whether and to what extent cross-examination was otherwise permitted; and (5) whether the prosecution's case was strong. *Van Arsdall*, 475 U.S. at 684, 106 S. Ct. at 1438; *Shelby*, 819 S.W.2d at 547; *Curry v. State*, 861 S.W.2d 479, 482–83 (Tex. App.—Fort Worth 1993, pet. ref'd). Finally, keeping the first two prongs in mind, we determine whether the error was harmless beyond a reasonable doubt. Tex. R. App. P. 44.2(a); *Shelby*, 819 S.W.2d at 547.

26

Here, assuming without deciding that the trial court abused its discretion by prohibiting cross-examination of Van Dyk regarding the internal investigation against him, we will perform the required harm analysis. *See Van Arsdall*, 475 U.S. at 684, 106 S. Ct. at 1438; *Shelby*, 819 S.W.2d at 547. Regarding the first factor—the importance of Van Dyk's testimony to the State's case—we agree with the State that Van Dyk's testimony was not of particular importance to the State's case. *See Van Arsdall*, 475 U.S. at 684, 106 S. Ct. at 1438. The State called twenty witnesses in its case in chief, including six eyewitnesses to the accident. Van Dyk did not testify as an expert and the State did not qualify him on the subject of sobriety testing or use his testimony to establish how he administered the tests or how Mole performed on the tests.[9] On direct examination, Van Dyk identified Mole as the driver of the Expedition, testified that he smelled alcohol on Mole's breath, confirmed that he performed field sobriety tests on Mole as shown on the videotape, and testified that he drove Mole to the hospital, where Mole consented to a blood test. Van Dyk also testified that he maintained the chain of custody of the blood. In view of the strength of the State's case, we cannot say that Van

---

[9] The State relied on a videotape of the sobriety tests to show the sobriety testing without additional testimony from Van Dyk. Mole only objected to the exclusion of hearsay audio on the videotape, not to the admission of the videotape itself.

Dyk's testimony was of great importance to the State.  *See id.*; *Smith v. State*, 236 S.W.3d 282, 294 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd).

Regarding the second factor—whether the testimony was cumulative—other witnesses identified Mole as the driver of the Expedition, two other officers testified that they smelled alcohol on Mole's breath, and other evidence introduced at trial showed that Mole was intoxicated that night.  *See Van Arsdall*, 475 U.S. at 684, 106 S. Ct. at 1438.  Mole's sister testified that Mole drank wine with dinner that night.  Van Dyk was the only officer to testify regarding how he maintained the chain of custody of Mole's blood.

A review of the third factor—corroborating or contradicting testimony—demonstrates that Van Dyk's determination that Mole was intoxicated was indirectly contradicted only by Mole's sister and his family friend; both testified that Mole seemed "fine" on the night of the accident.  *See id.*, 106 S. Ct. at 1438.  There was no evidence that Mole had not been drinking that night; his sister said he drank wine with dinner.  Several neutral witnesses corroborated Van Dyk's opinion that Mole was intoxicated.

Regarding the fourth factor—whether cross-examination was otherwise permitted—Van Dyk's cross-examination spans almost one hundred pages; his direct examination spans less than fifteen pages.  *See id.*, 106 S. Ct. at 1438.  Mole's defense attorney cross-examined Van Dyk regarding whether he made

28

mistakes during, and properly conducted, the field sobriety tests and the investigation of the accident, including whether he improperly shredded notes from the investigation against standard THP procedures. Van Dyk testified on cross-examination that he was no longer a state trooper and that he had questioned his own credibility during the same period of time that he was investigating this accident. Mole's defense attorney successfully introduced into evidence an apology letter from Van Dyk regarding his bad performance as a state trooper. In addition to the lengthy cross-examination regarding Van Dyk's credibility, Mole also called two officers to testify to their opinion of Van Dyk's credibility. Van Dyk's former supervisor testified that he personally thought, and knew of other individuals who thought, that Van Dyk's credibility as an individual and as a state trooper was "overall bad." State trooper Rudy Torrez testified that he knew Van Dyk and was of the opinion that Van Dyk was not credible or truthful.

Regarding the last factor, we previously have explained that the State presented a strong case against Mole.

Finally, after assuming that the damaging potential of the cross-examination was fully realized, reviewing the factors discussed above, and keeping in mind both the damaging potential and the five factors, we look to whether the trial court's error, if any, in prohibiting cross-examination of Van

29

Dyk regarding the internal investigation against him was harmless beyond a reasonable doubt. *See Shelby*, 819 S.W.2d at 547 (citing *Van Arsdall*, 475 U.S. at 684, 106 S. Ct. at 1438). Given the evidence of Mole's guilt—eyewitness testimony about his erratic driving and excessive speed before entering the intersection and that he ran a red light, testimony that the intersection stop lights were working properly, Mole's own admission that he had been drinking that night and may have looked down and not seen the red light, and other officers' testimony that Mole smelled of alcohol—the jury could have convicted Mole without Van Dyk's testimony. We conclude, therefore, that even if the trial court abused its discretion when it precluded Mole from cross-examining Van Dyk specifically about the THP's internal investigation of him, any error did not contribute to his conviction beyond a reasonable doubt. *See id.* (citing *Van Arsdall*, 475 U.S. at 684, 106 S. Ct. at 1438). Accordingly, Mole's fifth, sixth, and seventh points are overruled.

### D. VICTIM IMPACT AND VICTIM CHARACTER EVIDENCE

In his eighth and ninth points, Mole argues that the trial court abused its discretion by admitting certain victim impact and victim character evidence because no nexus exists between the complained-of testimony and his personal responsibility and moral guilt and because the evidence was irrelevant and unfairly prejudicial.

30

### 1. Evidence Introduced at the Punishment Stage

At the punishment stage of trial, the court heard testimony from multiple witnesses, three of whom are at issue here. Don Gates, the husband of Marilyn Gates, testified that Marilyn had worked for American Airlines and that when he flew home with Marilyn's body, the American Airlines flight crew stood up as her body was removed from the plane to show their respect for her. He described how his three children have responded to the death of their mother—one son will not talk about his mother, one son has become immersed in his work and his family, and their daughter has become very involved in MADD. Don also testified that his family is no longer as close as they used to be because "the cement that bonded [them] together is gone."

Beverly Brooks, who was injured in the accident and was a close friend of Marilyn's, testified to the effect that Marilyn's death has had on her family. She described the loss of Marilyn as creating a "big void" in the lives of her family members. She also testified about her injuries and her son Griffin's injuries.

Marilyn's daughter Melissa Larochelle testified that her mother was her best friend. Melissa explained that she was pregnant at the time of the accident and had planned for her mother to be involved in the birth of her first child. Melissa testified that her grandfather has difficulty speaking about

Marilyn and that her grandmother will not talk about Marilyn at all. Melissa stated that her siblings and parents used to get together every Sunday but that her brothers no longer participate and that her family has only been together twice since the accident.

### 2. Admissibility of Victim Impact and Character Evidence

The procedures to be followed at the punishment stage of trial and the evidence that may be considered in determining punishment are the subject of article 37.07 of the Texas Code of Criminal Procedure. *See* Tex. Code Crim. Proc. Ann. art. 37.07 (Vernon Supp. 2008). This statute authorizes the admission of evidence at the punishment stage of trial as to any matter the court deems relevant to sentencing. *Id.*

Victim impact evidence is evidence concerning the effect the victim's death will have on others, particularly the victim's family members. *Haley v. State*, 173 S.W.3d 510, 517 (Tex. Crim. App. 2005) (citing *Mosley*, 983 S.W.2d at 261). It is designed "'to remind the jury that the person whose life was taken was a unique human being.'" *Salazar v. State*, 90 S.W.3d 330, 335 (Tex. Crim. App. 2002) (quoting *Payne v. Tennessee*, 501 U.S. 808, 823–25, 111 S. Ct. 2597, 2607–08 (1991)). Victim character evidence, on the other hand, is defined as evidence concerning the good qualities of the victim. *Id.* It also serves to show each victim's uniqueness as an individual human being

32

and, therefore, the unique loss suffered by society and the victim's family because of the victim's death. *Payne*, 501 U.S. at 823–25, 111 S. Ct. at 2607–08. Victim character evidence is designed to remind the jury that crime has foreseeable consequences to the community and the victim's family and friends. *Salazar*, 90 S.W.3d at 335. Both victim impact and character evidence are "admissible at the punishment stage of a criminal trial when that evidence has some bearing on the defendant's personal responsibility and moral culpability." *Id.*

Victim impact and character evidence that is relevant may still be excluded if its probative value is substantially outweighed by the danger of unfair prejudice. *See* Tex. R. Evid. 403; *Boone v. State*, 60 S.W.3d 231, 239 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd), *cert. denied*, 537 U.S. 1006 (2002) (noting that "[i]t does appear that victim impact evidence can run afoul of rule 403" and that the court of criminal appeals has cautioned courts to place appropriate limits on such evidence). Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." Tex. R. Evid. 403. Considerations in determining whether testimony should be excluded under rule 403 should include the nature of the testimony, the relationship between the witness and the victim, the amount of testimony to be introduced, and the availability of

33

other testimony relating to victim impact. *Salazar*, 90 S.W.3d at 336. In order to avoid unfair prejudice under rule 403, courts are encouraged to place appropriate limits on the amount, kind, and source of victim impact and character evidence that is allowed. *Id.*

When considering the admissibility of victim impact and character evidence, the court must consider the following factors: (1) how probative is the evidence, (2) the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way, (3) the time the proponent needs to develop the evidence, and (4) the proponent's need for the evidence. *Id.*

### 3. Evidence Relevant to Mole's Personal Responsibility and Moral Culpability

Here, Mole argues that the testimony outlined above was irrelevant because the crimes he committed did not have a *mens rea* element and, consequently, "the nature of the offense" shows that there is no nexus between the testimony and Mole's personal responsibility and moral guilt. Mole cites no authority, nor do we find any, supportive of this proposition. To the contrary, the evidence had a bearing on Mole's moral culpability as a reminder of the foreseeable consequences of driving while intoxicated to the community and the victims' families and friends. *See Salazar*, 90 S.W.3d at 335; *Lane v. State*, 822 S.W.2d 35, 41 (Tex. Crim. App. 1991), *cert. denied*, 504 U.S. 920

(1992). In that regard, the evidence is relevant to show the circumstances of the offense. *See Jones v. State*, 963 S.W.2d 177, 182 (Tex. App.—Fort Worth 1998, pet. ref'd); *see also Jagaroo v. State*, 180 S.W.3d 793, 798–99 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd) (noting that testimony from family members of victims of intoxication assault and intoxication manslaughter, as well as testimony of victim of intoxication assault, were admissible as circumstances of offenses).

The victim impact testimony regarding how Marilyn's death impacted her family and her friend Beverly's family illustrated the consequences that Mole's actions had on the victim's family and friends. *See Salazar*, 90 S.W.3d at 335; *see also Moreno v. State*, 38 S.W.3d 774, 778 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (holding as admissible grandmother's testimony of psychological impact crime had on members of deceased's extended family, including suicide of deceased's uncle); *Boone*, 60 S.W.3d at 240 (allowing testimony from decedent's son that he missed his mother and as to his mother's good qualities); *Jones v. State*, 963 S.W.2d 177, 182 (Tex. App.—Fort Worth 1998, pet. ref'd) (holding that testimony from family's minister was admissible when he described the impact of the victim's death on the victim's family as a "disaster").

Regarding the victim character evidence of a tribute by American Airlines employees to Marilyn, the trial court could have reasonably concluded that the State was not comparing the victim's worth to anyone else, but instead was illustrating the victim's "uniqueness as an individual human being." *Payne*, 501 U.S. at 823, 111 S. Ct. at 2607. This testimony illustrated the victim's many years of service to her employer. *See Solomon v. State*, 49 S.W.3d 356, 366 (Tex. Crim. App. 2001) (holding that picture of victim in sailor's uniform simply reflected the victim's occupation and did not encourage comparisons between victim and other members of society). It focused on the victim's individual loyalty and service, as opposed to comparing her employment to other members of society. *Cf. Mosley*, 983 S.W.2d at 262 (finding evidence impermissible when it shifts from humanizing the victim and illustrating the harm caused by the defendant to measuring the worth of the victim compared to other members of society).

### 4. Evidence Not Unfairly Prejudicial

Regarding Mole's rule 403 complaint, the testimony at issue here was given by two immediate family members of the victim and one of the victim's close friends, all of whom had close relationships to the victim. *See Boone*, 60 S.W.3d at 240. The testimony was probative to illustrate the uniqueness of the victim and the harm caused by her death. *See Williams v. State*, 176

36

S.W.3d 476, 483 (Tex. App.—Houston [1st Dist.] 2004, no pet.) (permitting testimony from victim's mother regarding victim's character and effect of victim's death on her as probative to show the uniqueness of the victim and the harm caused by victim's death); *see also Mosley*, 983 S.W.2d at 265 (finding testimony from three of victims' family members admissible, even though it related somewhat to the character of the victims, because it mainly focused on the impact of the victims' loss of family members). The testimony was not prejudicial based on its volume; the questioning of these witnesses comprised about twenty pages. *See Salazar*, 90 S.W.3d at 336; *Williams*, 176 S.W.3d at 483. The questions and answers were brief, to the point, and not needlessly cumulative. *See Boone*, 60 S.W.3d at 240. Thus, the record does not reflect that the probative value of this evidence was substantially outweighed by its prejudicial effect. *See* Tex. R. Evid. 403.

Based on this record, we conclude that the testimony was relevant and that its admission did not unfairly prejudice Mole and was within the zone of reasonable disagreement. *See Manning v. State*, 114 S.W.3d 922, 926 (Tex. Crim. App. 2003); *Boone*, 60 S.W.3d at 240. Accordingly, we hold that the trial court did not abuse its discretion by allowing this testimony. *See Salazar*, 90 S.W.3d at 336; *Williams*, 176 S.W.3d at 483; *Mosley*, 983 S.W.2d at 262. We overrule Mole's eighth and ninth points.

37

## IV. Proposed Jury Charges

In his third and fourth points, Mole contends that the trial court erred by refusing his requested jury charges on the lesser included offense of driving while intoxicated (DWI) and on causation. We will address each of these points separately below.

### A. Lesser Included Offense Charge

We use a two-step analysis to determine whether an appellant was entitled to a lesser included offense instruction. *Hall v. State*, 225 S.W.3d 524, 528 (Tex. Crim. App. 2007); *Rousseau v. State*, 855 S.W.2d 666, 672–73 (Tex. Crim. App.), *cert. denied*, 510 U.S. 919 (1993). First, the lesser offense must be established by proof of the same or less than all the facts required to establish the commission of the offense charged. Tex. Code Crim. Proc. Ann. art. 37.09 (Vernon 2006); *Moore v. State,* 969 S.W.2d 4, 8 (Tex. Crim. App. 1998); *see Hall*, 225 S.W.3d at 536.

Second, some evidence must exist in the record that would permit a jury to rationally find that if the appellant is guilty, he is guilty only of the lesser offense. *Hall*, 225 S.W.3d at 536; *Salinas v. State*, 163 S.W.3d 734, 741 (Tex. Crim. App. 2005); *Rousseau*, 855 S.W.2d at 672–73. The evidence must be evaluated in the context of the entire record. *Moore*, 969 S.W.2d at 8. There must be some evidence from which a rational jury could acquit the

appellant of the greater offense while convicting him of the lesser included offense. *Id.* The court may not consider whether the evidence is credible, controverted, or in conflict with other evidence. *Id.* Anything more than a scintilla of evidence may be sufficient to entitle a defendant to a lesser charge. *Hall*, 225 S.W.3d at 536. Thus, we review the trial court's decision to deny Mole's request for a lesser included offense instruction under these standards.

Regarding the first step in our analysis, the misdemeanor offense of DWI is a lesser included offense of intoxication manslaughter. *See* Tex. Penal Code Ann. § 49.04(a) (Vernon 2003), 49.08 (Vernon Supp. 2008); *Henry v. State*, 263 S.W.3d 151, 154 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ("Because intoxication manslaughter includes all of the elements of DWI, intoxication manslaughter includes the proof required to establish the offense of driving while intoxicated."). A required element in the charged offense of intoxication manslaughter is causing the death of another by reason of the intoxication, which is not required in the requested lesser offense of DWI. *Henry*, 263 S.W.3d at 154 (comparing section 49.08(a) with section 49.04(a)). It is not enough that operation of a vehicle, even by an intoxicated person, causes the death; rather, the "death must be the result of the intoxication and proof must be made . . . of that thing which worked a causal connection between the intoxication and the death." *Daniel v. State*, 577 S.W.2d 231,

39

233 (Tex. Crim. App. 1979); *see Glauser v. State*, 66 S.W.3d 307, 313 (Tex. App.—Houston [1st Dist.] 2000, pet. ref'd) (op. on reh'g), *cert. denied*, 534 U.S. 1129 (2002).

Regarding the second step of the analysis, Mole specifically argues that he was entitled to a jury charge on the lesser included offense of DWI because eyewitness Castillo's affidavit and testimony supported the theory that the stop light was only yellow turning to red, rather than red, as Mole drove through the intersection. But as we have previously explained, Castillo's affidavit statement is not evidence that Mole did not run the red light; rather, it is evidence that Mole was speeding to make the light when it was turning red. And Castillo explained her affidavit statement at trial by stating that the light was red when Mole entered the intersection. Consequently, Castillo's affidavit statement does not constitute some evidence that Mole did not run the red light, and we find no such evidence in the record that would permit a jury to rationally find that Mole was guilty only of DWI. *See Hall*, 225 S.W.3d at 536; *Salinas*, 163 S.W.3d at 741; *Rousseau*, 855 S.W.2d at 672–73. We hold that the trial court did not err by refusing to instruct the jury on the lesser included offense of DWI and overrule Mole's third point.

## B. Causation Charge

In his fourth point, Mole argues that the trial court erred by refusing his requested jury instruction on concurrent causation. The requested instruction identified two alternative independent causes for the collision other than Mole's intoxication: (1) that the traffic control device malfunctioned or (2) that Gene Cordes disregarded a traffic control device.

An accused is entitled to an instruction on every defensive issue raised by the evidence. *Muniz v. State*, 851 S.W.2d 238, 254 (Tex. Crim. App.), *cert. denied*, 510 U.S. 837 (1993). Appellate review of error in a jury charge involves a two-step process. *Abdnor v. State*, 871 S.W.2d 726, 731 (Tex. Crim. App. 1994). Initially, we must determine whether error occurred. *Id.* at 731. If so, we must then evaluate whether sufficient harm resulted from the error to require reversal. *Id.* at 731–32.

The relevant law concerning concurrent causation provides that "[a] person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." Tex. Penal Code Ann. § 6.04 (Vernon 2006). Thus, for concurrent causation to be raised by the evidence, there must be evidence both that a concurrent cause was sufficient to cause the result and

41

that the conduct of the defendant was clearly insufficient to cause the result. *See Hutcheson v. State*, 899 S.W.2d 39, 42 (Tex. App.—Amarillo 1995, pet. ref'd).

On appeal, Mole argues that the trial court erroneously denied his concurrent causation jury instruction request because evidence existed that a malfunctioning traffic control device clearly caused the accident and Mole's conduct was clearly insufficient to cause the accident. *See* Tex. Penal Code Ann. § 6.04. Mole attempts to piece together eyewitness Castillo's affidavit statement that the light was turning red and eyewitness Raine's affidavit statement that Mole "appeared to run a red light" with (1) Jentgen's testimony that she had a solid green left turn arrow to turn onto Hebron from Marsh and (2) Brighton's testimony that Jentgen could not have had a green arrow at the same time that Mole's light was "yellow turning to red" as some evidence that the lights were malfunctioning. Brighton testified that any malfunction of the lights would cause all lights to flash to red in all directions at the intersection; Brighton also testified that it is impossible for traffic on Hebron to have a green light while traffic on Marsh also has a left turn green arrow. Additionally, Castillo testified at trial that Mole ran a red light, and Raine clarified at trial that Mole's light was red when he saw the two vehicles colliding. And as we have explained previously, there is no evidence that Mole did not run the red light.

42

*See* Tex. Penal Code Ann. § 6.04.  Therefore, because there is no evidence that a concurrent cause—a malfunctioning stop light—was sufficient to cause the accident and there was no evidence that Mole's conduct was clearly insufficient to cause the accident, we hold that the trial court did not err by refusing to submit to the jury Mole's requested concurrent causation instruction.  *See id.*; *Abdnor*, 871 S.W.2d at 731; *Hutcheson*, 899 S.W.2d at 42.  Accordingly, we overrule Mole's fourth point.

## V.  CONCLUSION

Having overruled Mole's nine points, we affirm the trial court's judgment.

SUE WALKER
JUSTICE

PANEL: CAYCE, C.J.; LIVINGSTON and WALKER, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED: April 23, 2009